# *WARD v. ALSUP.

## (*Jackson.* May 28, 1898.)

1. ACTION. *Not dismissed as merely colorable, when.*

   The Court finds that the motion to dismiss this action as a sham and colorable suit is supported by the affidavit of one of the *amici curiæ*, which is contradicted by the affidavits of the parties and their attorneys, and, thereupon, declines to proceed further in the investigation of this matter, as the suit must be dismissed on other grounds. (*Post, pp. 738–743.*)

2. SAME. *Dismissed as sham, when.*

   A suit will be dismissed though plaintiff has a good cause of action, if his principal object in prosecuting it is, not to redress his own grievances, but to obtain a decision that will affect third persons who are litigating the same question in another suit pending in another Court or jurisdiction. (*Post, pp. 740, 741.*)

   Cases cited: Reed v. Robb, 4 Yer., 66; State v. Wilson, 2 Lea, 210; Mayo v. Dickens, 6 Yer., 490; 8 How., 255; 6 Cranch, 147.

3. ATTORNEYS. *Duties of, as regards sham suits.*

   Attorneys are officers of the Court, and it is not only their right, but their duty, if they know or have reason to believe that the time of the Court is being taken up by the trial of a feigned issue, to inform the Judge of the fact, whether of counsel in the case or not. (*Post, p. 739.*)

   Cases cited: State v. Wilson, 2 Lea, 210; 12 L. R. A., 815.

4. TAXATION. *Complaint before Board of Equalization must be made before suit to recover tax paid under protest.*

   A taxpayer is not entitled to the benefit of the statute that authorizes him to pay under protest and sue to recover back any

---

*This cause was heard and determined with the case of *Robertson* v. *McMillan, Trustee,* from the Circuit Court of Crockett County, in which similar issues were involved and similar questions made. In this latter case, also, there was a motion to dismiss, supported by the affidavit of Mr. Trimble. Both parties and their counsel disproved every ground of the motion to dismiss. Messrs. Jerman & Craig and Sparrel Hill represented Robertson, and C. A. Goodloe represented McMillan. This case involved over $300 taxes.—REPORTER.

---
Ward v. Alsup.
---

tax that he conceives to be "unjust or illegal, or against any statute or clause of the Constitution of the State," and he cannot maintain suit therefor under the statute, unless he made complaint of his assessment at the proper time before the Board of Equalization. (*Post, pp. 744–750.*)

Code construed: §1059 (S.); §926 (M. & V.).

---
## FROM SHELBY.
---

Appeal from Chancery Court of Shelby County. STERLING PIERSON, Ch.

ROSEBOROUGH & JOHNSON for Ward.

Attorney-general PICKLE, J. C. BRADFORD, and GRANBERRY & MARKS for Alsup.

The importance and public character of the questions involved in this cause, and justice to the parties and their solicitors, justify, if they do not require, a full report of all the proceedings, and the presentation of the arguments of counsel, and of the evidence introduced on the motion to dismiss.

The pleadings in full are as follows, to wit:

### ORIGINAL BILL.

THE BILL OF COMPLAINT OF ANDREW J. WARD, A CITIZEN OF SHELBY COUNTY, TENNESSEE,

#### AGAINST

J. H. ALSUP, A CITIZEN AND THE TRUSTEE OF SHELBY COUNTY, TENN.

Complainant respectfully shows unto your Honor:

1. That he is a citizen and taxpayer of said

county of Shelby, and that the defendant is the Trustee of said county, and collector of State and county taxes therein for the year 1897.

2. That for 1897 all property was assessed at its fair cash value, except that of railroad, telegraph, and telephone companies. That the State tax upon complainant's property in said county, for 1897, was $56.25, and was assessed upon the full cash value of his property.

3. That complainant paid his said State tax for 1897 to the defendant, as Trustee of said county, after it came regularly into his hands for collection, on, to wit, March 24, 1898. This payment was made under protest, and to avoid distress of his property and the cost and penalties of delinquency. The receipt taken is hereto attached as "Exhibit A."

4. That the taxes assessed against real estate, including that of complainant, for the year of 1897, are illegal, unjust, and void, for the following reasons:

(a) That the system under which they were assessed is unconstitutional and void, in that it necessitates, or, at least, invites and permits, inequality in taxation, by providing for the assessment of different classes of property by different and varying methods, e. g., real estate and other property as one class, and railroad, telegraph and telephone properties as another class, by distinct and independent assessors and boards of assessors, the former by local County Assessors, and the latter by State

boards, without any common supervising superior, and without any uniform, mandatory rule enjoining equality.

(b) The law has failed to provide for the assessment of railroad, telegraph and telephone properties for 1897, and, as a consequence, the properties of these corporations, worth over $100,000,000, have, or can, entirely escape taxation for said year. Neither the assessment Acts of 1895 or 1897, made any provision for the assessment of this class of property for 1897. The attempted assessment under each of these Acts, is, therefore, void. The Act of Extra Session of the Legislature, relating to assessments of 1897, does not cure this defect. The omission to tax or provide for the assessment of such a valuable and important class of property vitiates all assessments of taxes for 1897, as being in violation of the requisites of equality and uniformity.

(c) That the said tax assessed against complainant's property for 1897, and sued for in this case, is illegal, unequal, unjust and void, even if the Court should sustain one or either of said attempted assessments of the properties of railroad, telegraph and telephone companies for 1897.

(1) He avers that the attempted assessment of railroad, telegraph, and telephone properties, made in 1896 for 1897, was made by a board of assessors that had authority to equalize the assessments of real estate for 1896 and 1897 among the counties

Ward *v.* Alsup.

of the State. The action of said Board of Assessors, in assessing railroad and other properties, was subject to revision by an appellate board, but its work of equalization was not subject to such revision, and its jurisdiction did not extend to equalization of personal property.

Complainant avers that said Board of Assessors did undertake to equalize the assessments of real estate as among the counties for 1896 and 1897, and that, in doing this, they adopted an arbitrary basis or standard of seventy-five per cent. of the actual cash value of such property. They, nevertheless, purposely, intentionally, and designedly left a large class of real estate, including that of complainant and all other situated in said county of Shelby, assessed at its full value.

He further avers that said railroad, telegraph, and telephone properties were assessed for said years at less than fifty per cent. of their values.

He avers that the foregoing action of said Assessors, though not actually fraudulent, was purposely, intentionally, and designedly performed, pursuant to a system or plan agreed upon to equalize real estate at seventy-five per cent. of its value. He does not aver that the valuation of railroad, telegraph, and telephone properties at less than seventy-five per cent. of their value was fraudulent, but it exists as a fact, and was done purposely, intentionally, and designedly.

(2) He avers that the attempted assessment of

railroad, telegraph, and telephone properties, made in 1897 for 1897, was 'made by a board having no powers of equalization over any other than these properties. This board had no authority to equalize assessments of real estate among the counties, or to equalize the assessment they were authorized to make with other assessments.

Complainant avers that said board of assessors did purposely, intentionally, designedly, and pursuant to a plan of their own, and in accord with a custom of long standing in this State, assess said railroad, telegraph, and telephone properties for 1897, as a class, at less than seventy-five per cent. of their fair cash value, and that for the same year all other property in the State was assessed, by other and distinct assessors, intentionally, purposely, and designedly, at its full value. Both said assessments of 1897 of railroad, telegraph, and telephone properties were passed upon and ratified, without substantial change, by the appellate or revising board.

5. Complainant avers that his only remedy for the injustice complained of is for the Court to declare his tax void *in toto* or in part, and give him a recovery in this case. The pay-under-protest statutes forbid him any other remedy than by suit of this character. Complainant is advised there is no provision for back assessment of railroad, telegraph, and telephone properties covering the year 1897, whereby these properties may by that process be raised to the same level of valuation as other prop-

Ward *v.* Alsup.

erties. He is, moreover, advised that back assessment is not an adequate remedy for the irregularities complained of.

The County Boards of Equalization and Assessors, though aware of the irregularity complained of, refuse to put down assessments within their jurisdiction below cash value, or to equalize on a lower basis with the Assessors of railroad, telegraph, and telephone properties. The State Board of Assessors refuse to put up railroad, telegraph, and telephone assessments to the standard of fair cash value. Any attempt at back assessment is in vain, as there is no law authorizing it, and such method is inadequate.

6. Premises considered, complainant prays that the defendant named in the caption be made such by due process, and required to answer this bill, and that he be decreed, on final hearing, a recovery of the amount of said tax. He prays for general relief.

ROSEBOROUGH & JOHNSON,
*Solicitors for Complainant.*

DEMURRER.

| | |
|---|---|
| ANDREW J. WARD<br>*v.*<br>JOHN H. ALSUP, *Trustee.* | *In the Chancery Court of Shelby County,*<br>*March Term, 1898.* |

The defendant comes, by M. R. Patterson, District Attorney, and Henry Walsh and James H. Malone, attorneys, and demurs to the bill for the following causes:

1. The system of taxation in Tennessee is consti-

16 P—40

tutional and valid, notwithstanding the alleged vices therein. There is nothing in it that necessarily produces inequality or want of uniformity.

2. The statutes do provide amply for assessment of railroad, telegraph, and telephone properties for 1897, and assessment thereof was duly made. Either the assessment for 1897, made in 1896, or that made in 1897, one or the other, is valid and collectible.

3. The assessment for 1897 for all other than railroad, telegraph, and telephone properties at fair cash value, is not vitiated by any failure to assess railroad, telegraph, and telephone properties at less than their fair cash values, or for any failure to equalize assessments of the several classes of property.

4. The remedy for disproportionate and unequal assessments is not reduction of the proper assessments, but increase of the inadequate assessments by back assessment. Wherefore, defendant prays, etc.

M. R. PATTERSON,

*District Attorney.*

HENRY F. WALSH,
JAMES H. MALONE,
*Attorneys for Defendant.*

The bill was dismissed, and complainant appealed.

The proceedings in the Supreme Court upon the motion of the *amici curiæ* to dismiss, are as follows, to wit:

Ward *v.* Alsup.

## MOTION TO DISMISS.

ANDREW J. WARD, *Appellant,*
    *v.*
JOHN H. ALSUP, *Appellee.*
    *To the Honorable the Judges of the Supreme Court of Tennessee, sitting at Jackson, Tennessee:*

Come the undersigned, J. M. Dickinson, E. H. East, Vertrees & Vertrees, Fentress & Cooper and Adams & Trimble and Shields & Mountcastle, attorneys and officers of this Court as *amici curiæ,* and move the Court to dismiss this action upon the ground and for the reason that the same was when instituted, and now is, a sham action, colorably instituted between the plaintiff and the defendant, not for the purpose of recovering in good faith the money demanded therein, but simply to obtain the judgment and decision of this Court upon a feigned issue, gotten up for the sole purpose of inducing this Court to determine a question of law which may effect, and for the express purpose of affecting, other parties not impleaded, but who are litigating similar questions in another Court, to wit: the Circuit Court of the United States, sitting at Nashville, and the United States Circuit Court of Appeals for the Sixth Circuit. . . .

This motion was supported by a single affidavit, that of C. H. Trimble, one of the *amici curiæ,* which, omitting exhibits as unimportant, is in the words and figures following, to wit:

### TRIMBLE'S AFFIDAVIT.

C. H. Trimble, being duly sworn according to law,

under oath says, that he is an attorney at law of the Memphis bar, and is one of the counsel engaged for the Kansas City & Memphis Railway & Bridge Company in a bill filed in the Circuit Court of the United States, at Nashville, Tennessee, enjoining the assessment of its property, which was about to be certified by Robt. L. Taylor and others, acting as a Board of Equalization, which is referred to in the petition filed in this case.

He further says that he did not know, and, so far as he is advised, none of the counsel for the other railroad companies mentioned in said petition were aware, of the proceedings in this case instituted in the Chancery Court of Shelby County, Tennessee, until after an appeal had been taken from the decree of the Chancellor. That the first knowledge he had of said proceedings was derived from the newspaper publication on or about March 26, 1898.

He further says that he has examined the original bill and demurrer now remaining in the files of said Court; that the bill and demurrer were both written upon paper of the same size, thickness, texture, and ruling, and were apparently written by the same typewriter, by the same person; that the said bill and demurrer were fastened together with the same kind of brads; that a photographic copy, Exhibit No. 2 to the petition, is a correct photographic copy made from the first page of said bill and the first page of said demurrer.

He further says that, on or about March 31, 1898,

W. S. Roseborough, Esq., of the firm of Roseborough & Johnson, was interrogated by affiant, and that he declined to state who drew the original bill filed in this case; that he declined to state whether or not it was drawn in his office; that he declined to state who paid, or is to pay, the fee of his firm for legal services in this case; that he declined to state from whose hands he received the said bill, if from anyone. That on the said day affiant interrogated J. H. Malone, Esq., of counsel for the defendant, and, in response to questions propounded by the affiant, he, the said Malone, declined to state who drew the bill; that he declined to state who is to pay the fee of counsel, or who employed him; that he declined to state where he got the said bill, or from whom he received it, and he declined to give any information whatever concerning that suit. That, on the same day, R. Lee Bartels, Esq., was interrogated by this affiant, and he stated that he had originally signed the bill filed as counsel for the plaintiff, but that he afterward erased, or caused to be erased, his name as counsel; that the reason for this action on his part was that he did not consider that he had had time to properly study and present the questions involved; that the bill already drawn was handed to him by Mr. Malone, with the request that he sign it as counsel for the plaintiff; that he did not see the plaintiff; that he was not requested by the plaintiff to act for him, and that plaintiff did not promise to pay him any fees; that he under-

stood the case was to be a test case, and he was
not certain whether he would get a fee or not, but
he understood from Mr. Malone that he would get
a fee, but whether he did or not he was willing
to sign it out of friendship for Mr. Malone; that
when he decided not to act as counsel he returned
the original bill to Mr. Malone, and did not
know what Mr. Malone did with it. He declined
to say from whom Mr. Malone received this bill.
He stated on that day that he was willing to
make an affidavit to these facts, and that with that
end in view this affiant prepared a form of affidavit
to be signed by him, which was handed to Mr.
Bartels on the fourth day of April, 1898. At the
time this affidavit was handed to Mr. Bartels he
stated it was not accurate in some respects, among
others, that he did not mean to be understood as
saying that he did not consider himself competent to
present the questions, but that he had his name
taken off because he had not had time to prepare
the case properly, and that the draft of the affidavit
was incorrect in that he did not mean to be under-
stood as saying Mr. Malone had left him under the
impression that he was to receive a fee, the fact
being that he then said that he did not know
whether he was to receive a fee or not, otherwise
the affidavit was substantially correct, and that he
would take it and let the affiant know later in the
day, or about 2 o'clock, whether he would make the
affidavit; that later in the day the said Bartels in-

formed affiant that he had concluded to have nothing more to do with that matter; that he would not make an affidavit. The draft of this affidavit is herewith filed as "Exhibit No. 1" to this affidavit.

Affiant further says that on the 4th day of April, 1898, he interrogated J. H. Alsup, County Trustee of Shelby County, the defendant in this case, and that said Alsup, then, as he had before, stated to affiant that he did not employ counsel, and that he was not served with process until after the 25th day of March, 1898. Affiant requested him to make an affidavit to these facts, presenting to him a draft for the same, embodying in said affidavit, which is filed as "Exhibit No. 2," the substance of the statement made by said Alsup, but he, the said Alsup, declined to make an affidavit on the ground that he did not wish to be mixed up in the matter. He stated that the statements in the affidavit were substantially true.

That on the thirty-first day of March affiant interrogated plaintiff, Andrew J. Ward, at his residence, about twelve and one-half miles from the city of Memphis, and asked him whether the suit which he had instituted in this case was in good faith or was for the purpose of raising the question at law, and he replied that he would give no information whatever about the case until he had seen his attorneys, which he would do within a very few days, and that if he had any statement to make he would communicate the substance thereof through F. B.

Caldwell to affiant, but that he has not, up to this time, made any statement whatever; and he was asked who his attorneys were by affiant, and he replied that they were Scarbrough & Johnston, instead of Roseborough & Johnson, the latter being the real name of the firm.

Affiant further states that he has examined the records in the office of the County Trustee of Shelby County, and finds no evidence that A. J. Ward paid any taxes on the twenty-fourth day of March, 1898; that the records do show that on that day W. J. Chase paid $125 by check, which sum was in settlement of State and county taxes for the year 1897, on seven tracts of land, five of which are situated in the third civil district of Shelby County, and two of which are situated in the fifteenth civil district of said county; that five of these tracts are assessed in the name of W. J. Chase, and stand upon the records of the Trustees's office as tax bills No. 26, $12; No. 25, $14; No. 24, $15, in the third civil district and No. 201, $10; No. 202, $30, in the fifteenth civil district, all assessed to W. T. Chase. That in the third civil district was bill No. 174, upon real estate assessed to Mrs. P. P. Ward, $12; No. 173, assessed to Mrs. P. P. Ward, $32, the aggregate of these sums being $125, and that the State taxes and the school taxes levied on these properties amount to $56.20, the amount sued for in this bill.

Affiant further says that the name of R. Lee Bar-

tels appears on the face of the bill to have been erased, so as to be almost illegible, and that over his signature is written the name of Roseborough & Johnson; that it was with exceeding great difficulty, and only after many efforts by several persons, that, the name of the said Bartels was read.

Affiant further says that on the fifth day of April, 1898, he was informed that a case similar to this had been instituted in Crockett County by one Robertson against one McMillan, Trustee of said county, for substantially the same cause of action, and that the same had been appealed to the Supreme Court of Tennessee, and is now there pending.

Affiant, on the sixth day of April, 1898, visited Alamo, the county seat of Crockett County, and there inspected the original declaration and demurrer, and found that the said declaration and demurrer were written upon the same kind of paper, apparently by the same typewriter, and that the allegations of the declarations and demurrer were drawn in the same form and used substantially the same language as the bill and demurrer filed in this cause, only such changes appearing to have been made as were incident to the difference in names of the parties, the locality of the Court, and the amount of the taxes sued for, all of which will be seen by comparison of the copy of the declaration and the demurrer now in this Court on appeal of said case of *Robertson* v. *McMillan*, from Crockett County, with the copy of the bill and the demurrer in the trans-

cript now on file in this Court on appeal in the case of *Ward* v. *Alsup.*

The complainant, Ward, through his solicitors, Roseborough & Johnson, made the following reply to said motion to dismiss to wit:

### ANSWER OF COMPLAINANT.

Appellee, Ward, by his attorneys and solicitors, comes and resists the filing of the petition, or, if filed, moves to strike the petition from the files, which has been presented by the railroad companies as *amici curiæ* through their attorneys, seeking a dismissal of these cases without a hearing in this Court, and upon the following grounds, to wit:

1. Said railroad companies are not parties to, and have no interest whatever in, the subject-matter of this suit, and show no cause why they should be permitted to delay or defeat the hearing of these causes.

2. No sufficient evidence is submitted or referred to by said petition to impeach the good faith of either of said suits. A single affidavit is presented, and that by the attorney of one of the railroads, stating and relating nothing but hearsay, which he obtained while acting in something of the character of a detective. The affidavits in blank which accompany these attorneys' affidavits are such as the parties refuse to swear to, because they were not true, as shown by affidavits of the same parties hereto attached.

3. This Court will not seriously entertain a motion which reflects not only upon the good faith of

the parties litigant, but upon the integrity of the County Trustees and the District Attorney and of the Attorney-general for the State, upon such hearsay statements as the attorney or detective of the railroad company could gather by the utmost diligence, and more from what the parties refused to say than from what they actually said. Moreover, the litigants and attorneys in this case, and public officials involved, had a perfect right to refuse to answer the impertinent questions propounded by the attorney or detective of the railroad companies. There is no obligation upon any State official, or upon any attorney, or upon any client, to give any such matters as are generally regarded as privileged communications, to any officious person who may have the presumption to ask about them. Every official, attorney, or client has the right to preserve their own business affairs, and refuse to answer any impertinent inquiries about them.

4. That these are *bona fide* cases the Court will strongly presume, as they have upon their face every mark of a *bona fide* lawsuit, and the indorsement of the County Trustees and the District Attorneys, but, in addition, there is herewith submitted the affidavit of counsel showing that, in point of fact, the suit is not only brought in good faith to settle questions of law, but to recover a sum of money, and brought, too, by counsel who has confidence in the questions made, which he has vindicated by a brief, which is herewith submitted as part of this motion.

In support of this answer, the affidavits of complainant, Andrew J. Ward, and defendant, John H. Alsup, and of the following attorneys, viz., W. S. Rosebrough, R. O. Johnson, James H. Malone, R. Lee Bartels, M. R. Patterson, and Henry F. Walsh, were submitted.

### AFFIDAVIT OF ANDREW J. WARD.

Andrew J. Ward, being first sworn, makes oath as follows:

1. That he is the owner by deed of the property referred to in the petition filed by the railroad lawyers, and in the affidavit of C. H. Trimble.

2. That he paid the taxes upon said property under protest, and has now the original receipts therefor in his possession showing that fact; that he made the payment through W. J. Chase, his merchant, as has been his custom for twenty-five years last past. He authorized his attorney to show these receipts in open Court, copies of which are marked, "Exhibit A," attached to this affidavit.

3. That he employed Roseborough & Johnson to bring this suit in good faith, believing that he was entitled to the relief sought. Though a farmer, he has thought considerable upon the question of railroad taxation as compared with taxation upon the farmer, and he believed then, and believes now, that in the assessment and collection of taxes great injustice has been done the farmers and in favor of the railroads, hence, he brought this suit.

Ward v. Alsup.

4. While affiant is a man of small means, he is willing to contribute something towards what he considers for the public good, and he employed and paid to his counsel, Roseborough & Johnson, in this case, a retainer fee of twenty-five dollars, and hopes to be able to adequately compensate them for their labor and services in this case. He makes as "Exhibit B," the receipt taken for him for the retainer fee n this case. In this connection he begs permission to say that he was bred and born in Shelby County, Tennessee, and that he fought for his country in times of war, and now has the courage to fight for his rights in times of peace.

4. As to the affidavit of C. H. Trimble, who came to his home in a remote, rural district of Shelby County, and found affiant at work upon a gate leading to a pool in his lot, he is sorry to say, that he brought with him·———, at the present time a member of the Legislature from Shelby County, and heretofore a strong friend of this affiant. The Honorable ———, upon the approach of himself and the said Trimble, remarked that they had a warrant against affiant for stealing cows. After the gentlemen were seated upon the porch, they made known their business, when affiant promptly stated that he did not wish to be rude to gentlemen in his own house, but he refused to discuss the matter referred to by them, and referred them for all particulars to his counsel at Memphis, whom he had employed to represent him in his case.

6. So far as affiant is concerned, he has not colluded with Mr. Alsup, or anyone else; in fact he has not seen Mr. Alsup, and he expects and certainly hopes to win this lawsuit.

7. Said Trimble stated that he was the attorney for the Kansas City road, and had no interest in this litigation.

### TAX RECEIPT.

MEMPHIS, TENN., April 4, 1898.

Received of A. J. Ward ($25), twenty-five dollars, retainer in case of *Ward* v. *Alsup, Trustee.*

ROSEBOROUGH & JOHNSON, *Attorneys.*

### AFFIDAVIT OF J. H. ALSUP.

J. H. Alsup, being duly sworn, says that as soon as he heard of this suit against him, he at once consulted Henry F. Walsh, his regular attorney, and authorized him to appear and defend the case; that while the taxes were paid by the check of W. J. Chase, he understood Chase was simply the merchant for Ward, and he knows the payment was made in the name of Ward, and affiant made out receipts stating these facts and showing that the taxes were paid under protest. Affiant emphatically denies all collusion in any manner, shape, or form with Ward or anyone else. He declined to sign the affidavit referred to for the simple reason it did not correctly set forth what was said.

Ward *v.* Alsup.

### AFFIDAVIT OF JAMES H. MALONE.

James H. Malone, being duly sworn, says he was consulted professionally and requested to file a bill similar to that in *Ward* v. *Alsup*, and, after consideration, he declined, upon the ground that he did not think the case well founded in law, and recommended Mr. Bartels, who, after examination, said he would take the case, but afterwards said that he did not have sufficient time for preparation, and thereupon affiant recommended Roseborough & Johnson as attorneys, and they accepted the case. Affiant had no thought of appearing in the case, until Henry F. Walsh, the regular attorney for Alsup, asked respondent, after the bill had been filed, if he had not kept up closely with the points involved in the case, and being answered, "Yes," said Walsh requested affiant to sign his name to the demurrer, and appear with him for Alsup, which he did, the argument before the Chancellor lasting about two hours. It was understood that the affiant was not to make any further appearance in the case. It is true affiant refused to answer the question put by the railroad lawyers, stating that he regarded their questions as a piece of impertinence.

### AFFIDAVIT OF R. LEE BARTELS.

R. Lee Bartels, being duly sworn according to law, under oath says, that he is an attorney practicing law at Memphis, Tenn.; that about the first day of April Mr. C. H. Trimble came to affiant and said

he wished to interrogate affiant in regard to the above case; that at first affiant refused to answer Mr. Trimble's questions, and he was then told that he intended to file interrogatories in the Supreme Court which affiant would have to answer, or words to this effect, leaving upon affiant's mind the impression that if he did not state what he knew of the case there and then, he would be forced to do so at a subsequent time; that then affiant told said Trimble what he knew of said case; that the said Trimble asked affiant if he would make affidavit to what affiant told him, and affiant answered he would do so; that a few days later the said Trimble brought to affiant the affidavit made an exhibit to the petition to dismiss, and which is set out in the printed edition at page 13; that affiant read the same over, and called to the attention of the said Trimble the many inaccuracies in said affidavit, to which the said Trimble replied: "Very well, swear to the balance;" that he took said affidavit, and after considering the same for a few hours, refused to swear to it, and returned it to the said Trimble without comment; that said affidavit is and was wholly untrue, in that it stated that affiant had an office with J. H. Malone; that this affiant understood from said Malone that he was to receive a fee for his services, to be paid by others than the complainant, and in that it stated that affiant considered himself incompetent to present the case properly, and that affiant supposed that the bill was taken to Mr. Roseborough by Mr. Malone, after affiant

refused to bring the suit. Affiant states these facts, so far as he knows, to be wholly untrue, and affiant never told said Trimble that they were true.

Affiant refused to sign said affidavit with the inaccuracies corrected, though sought to do so by said Trimble, his reason for refusing being that he cared to have nothing to do with the matter, and, further, that he considered the said Trimble to have acted wrongfully in coming to affiant, and, after getting information from him, which consisted of confidential communications between affiant and his client, to so use that information to further his own interests and that of his client, to the detriment of affiant and his client.

### AFFIDAVIT OF M. R. PATTERSON.

M. R. Patterson makes oath that the filing of the bill in the cause was brought to his attention by Henry F. Walsh, the regular counsel for J. H. Alsup, briefly explaining the points involved, and he was requested to sign his name as counsel to the demurrer, which he did in his official character, and, so far as his information extends, there was no collusion of any kind whatever between the parties.

### AFFIDAVIT OF HENRY F. WALSH.

Henry F. Walsh makes oath that he is the regular attorney of J. H. Alsup, and was specially requested to appear for him in this case. The cause was regularly called to the attention of the Chancel-

16 P—41

lor, in open Court, by counsel for Ward, when there was a large attendance of the bar, and the Chancellor, in open Court, ordered an oral argument that afternoon at three o'clock, which was had. The charge of collusion, so far as affiant is concerned, or as far as his knowledge extends, is absolutely not true. '

### AFFIDAVIT OF W. S. ROSEBOROUGH.

Wm. S. Roseborough, being duly sworn according to law, under oath, says:

1. That he is an attorney at law of the Memphis bar, and is a member of the firm of Roseborough & Johnson, and is one of the counsel in the above styled cause.

2. He further says that C. H. Trimble did approach him on the thirty-first day of March, 1898, and asked said questions as alleged (and others not necessary to mention) in his affidavit bearing date of April 11, 1898. Said questions were asked under the guise of friendship ("*amici curiæ*"), otherwise they would have been unbearable.

3. Affiant declined to answer said questions for the following reasons:

(*a*) That upon being admitted to the bar, he made oath that he would be "true to his clients." He regards this oath as sacred and binding, and not as a mere matter of form.

(*b*) That, in his opinion, it was unbecoming and unprofessional to answer said questions.

(*c*) That, being a lawyer and a law-abiding citizen, he could not be guilty of a misdemeanor; not even to please so clever a gentleman as Brother Trimble. Shannon's Code, § 5787.

(*d*) That he was unwilling to lay himself liable to a fine of $1,000, imprisonment for two years, be stricken from the rolls of practicing attorneys, and disgraced in the sight of God and man, just for the pleasure of obliging Brother Trimble.

(*e*) That "confidential communications" between attorney and client are held sacred and inviolate by law and lawyers.

(*f*) That the law and rights of lawyers should be respected even by railroad attorneys.

(*g*) That for these reasons and other reasons not necessary to mention, affiant declined to answer the questions of this esteemed brother, Trimble.

4. Affiant makes no charges against his brother, Trimble, but feels deeply wounded that said Trimble should procure the services of the Hon. ——, a legislator of Tennessee, and a bosom friend of appellant, Ward, and together proceed to the home of appellant, and under his own "vine and fig tree" pry into the "confidential communications" existing between lawyer and client, and this too under the cloak of friendship (*amici curiæ*). Affiant believes that he is justified in saying that such a procedure is more becoming to a detective than to a learned and dignified lawyer like Brother Trimble.

5. Affiant further states that he was not aware of

the fact that a similar case was brought in Crockett County, Tenn., until after the case of *Ward* v. *Alsup* had been appealed from the decree of the Chancellor. Affiant has not had the pleasure of meeting any of the parties or attorneys in the Crockett County case.

6. Affiant further states this suit is a *bona fide* case; that Ward has paid a retainer fee, and it was brought in good faith, and in evidence of this fact files a brief prepared by his firm at their own expense, expressly for this case, and marked "Exhibit A," and made a part of this affidavit. Affiant further states that neither he nor his partner, Mr. Johnson, has entered into any cullusion whatsoever with appellee or his attorneys, but as a matter of fact it is a legal battle, pure and simple, which has been hotly contested.

7. Affiant, when approached by the railroad attorneys, invited the firm of Fentress & Cooper, through Judge Fentress, attorneys for the Illinois Central Railroad Company, and also the firm of Adams & Trimble, attorneys for the Kansas City road to associate themselves with the firm of Roseborough & Johnson, and represent appellant in the Supreme Court of this State, and upon receiving a negative answer, insisted upon said attorneys filing a brief on the legal points involved.

8. Affiant states that he has not yet been able to fathom the meaning of his friend Trimble, when he requested him to withdraw from this lawsuit, and to advise his client to do likewise. Said Trim-

ble was fearful that this case would damage the professional character of affiant, and was only advising him as a friend, and because he was solicitous of his future welfare.

Affiant wishes to state, in conclusion, that it will be a sad day for Tennessee when her citizens are denied a "hearing" in their own State Courts, unless they "bow the knee" and meet the whims of powerful corporations.

### AFFIDAVIT OF R. O. JOHNSON.

R. O. Johnson, after being duly sworn in accordance with law, says that he is an attorney at law of the Memphis bar, and is a member of the law firm of Roseborough & Johnson, and is one of the counsel in the above-styled cause.

2. Affiant further states that he was not aware that a similar case was brought in Crockett County until several days after the case of *Ward* v. *Alsup, Trustee,* had been appealed from the decree of the Chancellor.

3. Affiant further states that this is a *bona fide* case, is not collusive, and that our client, A. J. Ward, has paid us a retainer.

### BRIEF AND ARGUMENT OF ATTORNEY-GENERAL PICKLE
### ON THE MOTION TO DISMISS.

These are simply suits brought, and authorized by statute to be brought, by taxpayers against County Trustees to recover back taxes paid under protest.

The motion to dismiss characterizes them as sham suits, and as presenting feigned issues, and as being fraudulent and collusive.

1. The motion to dismiss is supported by a single affidavit, to wit: the affidavit of C. H. Trimble. The substance of that affidavit is the same in each case. He states that he finds indications on the face of the pleadings that the bill and demurrer in one case and the declaration and demurrer in the other case were perhaps written in the same office and on the same typewriter. He further states that he, in something of the character of a detective, sought the parties to the causes, and examined them and their counsel touching the good faith of the suits, and that they declined to answer his questions. He infers from this fact that the suits were not brought in good faith.

This is about all there is of the affidavit when it is boiled down, and comes very far short of making a case of collusion, or one that the parties or their attorneys should be required to answer at all. It should not be forgotten that not only ordinary litigants and their attorneys are connected with these cases, but also public officials—to wit: County Trustees and District Attorneys and County Attorneys, who act under oaths of office, and are therefore entitled to a stronger presumption in favor of the correctness of their conduct.

Considerations of this sort are not needed in this case, because not only the parties but their attorneys,

Ward *v.* Alsup.

and the public officials connected with the cases, have come forward and proved by their affidavits, beyond all doubt or controversy, that these suits are genuine lawsuits, without the color of collusion or fraud. While it is somewhat humiliating for public officials to have to make affidavit to the correctness of their conduct upon such showing as is ·made by the affidavit of Mr. Trimble in this case, they have nevertheless voluntarily done so, and have left no room for doubt about the good faith of this suit.

As regards the presumption that the Court should entertain in favor of the good faith and correctness of Court proceedings, the language of Chief Justice Marshall in *Fletcher* v. *Peck*, 6 Cranch, 147, is worth quoting. He says: "I have been very unwilling to proceed to the decision of this cause at all. It appears to me to bear strong evidence upon the face of it of being a mere feigned case. It is our duty to decide on the rights but not on the speculations of parties. My confidence, however, in the respectable gentlemen who have been engaged for the parties has induced me to abandon my scruples in the belief that they would never consent to impose a more feigned case upon this Court."

I desire to add, not by·way of affidavit, but upon my official oath as an officer of this Court, my conviction and belief that these suits are proper suits, brought in good faith, and should be determined upon the record by this Court.

2. The parties who have made this motion have

failed to distinguish between a fraudulent and collusive suit and an amicable suit, and also have failed to distinguish between an interest in the subject-matter of a suit and an interest in the question involved.

In regard to the distinction between an interest in the subject-matter and an interest in the question involved, this Court, in *State* v. *Wilson*, 2 Lea, 210, has said:

"The petition, however, if we treat it as an affidavit filed in this Court, does not pretend that the demand in controversy is fictitious. Its burden merely is that the agreed case is so worded as to ignore the rights of petitioners' clients, but if the demand is genuine, parties are not called upon to make their cases with a view to the rights of others, and it is an axiom of the law that the rights of others are not affected by a decision between particular parties. The proceedings are *res inter alios acta*—only conclusive between those persons before the Court, and their privies."

In regard to the distinction between a collusive suit and an amicable suit, Chief Justice Taney, in *Lord* v. *Veazie*, 8 Howard, 255, said:

"The suit is spoken of in the affidavits filed in support of it as an amicable action, and the proceeding defended on that ground, but an amicable action, in the sense in which these words are used in Courts of justice, presupposes that there is a real dispute between the parties concerning some matter of right, and in a case of that kind, it sometimes happens

Ward v. Alsup.

that for the purpose of obtaining a decision of the controversy without incurring needless expense and trouble, they agree to conduct the suit in an amicable manner; that is to say, that they will not embarrass each other with unnecessary forms or technicalities, and will mutually admit facts which they know to be true, and without requiring proof, and to bring the point in dispute before the Court for a decision without subjecting each other to unnecessary expense or delay, but there must be an actual controversy and adverse interests. The amity exists in the manner in which it is brought to issue before the Court, and such amicable actions, so far from being objects of censure, are always approved and encouraged, because they facilitate greatly the administration of justice between the parties. The objection in the case before us is not that the proceedings were amicable, but that there is no real conflict of the interests between them; that the plaintiff and the defendant have the same interests, and that that interest is adverse and in conflict with the interests of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be."

In the case from which the above is quoted, the Court found: "That the contract set out in the pleadings was made for the purpose of instituting this suit, and that there is no real dispute between the plaintiff and defendant. On the contrary, it is evident that their interest in the question brought

here for decision is one and the same, and not adverse, and that, in these proceedings, the plaintiff and the defendant are attempting to procure the opinion of this Court upon a question of law, in the decision of which they have a common interest, and opposed to that of other persons who are not parties to this suit, who had no knowledge of it while it was pending in the Circuit Court, and no opportunity of being heard there in defense of their rights."

The distinction between that case and the one at bar is most manifest. In the case at bar, if the plaintiff wins, he obtains a moneyed judgment, to be certified and paid out of the State treasury. If he loses, he will be subjected to the payment of the costs of the suit. The interests of the parties are as adverse as it is possible for that of litigants to be, and it can make no difference that either or both of the parties desire to have the question of law involved in the case put at rest for the benefit of themselves in the future as well as for the benefit of the public at large.

Along this same line are the utterances of Judge Taft in the case of *Western Union Telegraph Co.* v. *Poe*, 64 Fed. Rep., 12. In that case, the Attorney-general of Ohio advised the Auditor not to certify the taxes in suit. He then, being himself one of the relators, brought mandamus to force the Auditor to certify the taxes in question. He prepared both the petition for mandamus and the answer thereto.

Ward *v.* Alsup.

He secured a friend to sign the answer, and himself represented the petition. In order to prevent a decision, the taxpayer came in and tendered the full amount of the taxes before any decision had been made. The Supreme Court of Ohio nevertheless rendered an opinion, upon the authority of which Judge Taft recalled his former opinion to the contrary, declaring the Nichols law void, and he followed the opinion of the Supreme Court of Ohio, saying, in reply to the charge that the case was a collusive one: "The case was a test case brought before the Court in a summary way, as many such constitutional questions are brought there, and full opportunity was given for argument of counsel interested to invalidate the law. It is doubtless true that the case was hurried by counsel for the State, because it was properly thought that the decision of the Supreme Court of the State, the ultimate tribunal upon such questions, would be much more satisfactory for the purpose of administering the law throughout the State than any judgment which this Court could give. All the facts tending to show the friendly character of the mandamus proceedings, and the made-up features of the case, were known to the Supreme Court of Ohio, but that Court held it was not a moot case, and that it was one calling for consideration by them."

It appears in both of these cases that the attorneys for the railroads, whose counsel are intervening as *amici curiæ,* were invited to participate in the argu-

ment in this Court, and they scornfully refused to do so.

It is easy to distinguish the cases cited in favor of this motion, so far as we are able to have access to them. The motion was disallowed in *State* v. *Wilson*, upon the ground, among other things, that the solicitors of parties in interest, without the parties themselves coming before the Court, should not have the right to present any question as *amici curiœ*. In that case it will be observed, moreover, that the parties whose solicitors were complaining, were entitled to have been made parties and to have been heard in regard to the very subject-matter involved in the suit. The statute directed that a general creditors' bill should be filed against all taxpayers, and that everybody should be heard in that proceeding, whether creditor or taxpayer. The bill filed was by the collector against a single taxpayer. Moreover, the parties whose solicitors were complaining, had, in a Federal Court proceeding, previously tied up the very subject-matter involved in the suit in which they sought to intervene. The Court will see that the complaining parties had in this Wilson case an interest in the subject-matter and a statutory right to be heard, and that, had they properly intervened, ought to have had relief.

The case of *Hayley* v. *Bank*, 12 L. R. A., 815, is a very remarkable one, and somewhat complicated upon its facts, but a reading of the majority and minority opinions will, I think, convince anyone that

the latter is the correct view of the law. In that case the Court, by the majority opinion, sustained a proceeding made on behalf of a defendant, which presented the whole question to be tried upon the merits, and determined it upon affidavits in advance of the hearing, and the Court did this in favor of a party who appears to have been guilty of such conduct as should have repelled him from a Court of Equity, and who had previously made default in the particular case. This Court will find abundant reasons for not following that case.

It will appear in the case of *Swenson* v. *Sage*, by an examination of the briefs and the order of the Court, that the writ of error was dismissed in that case because it was "not authorized" by the party in whose name it was sued out. This appears from the face of the order, a copy of which is in the record. Of course, it was proper to dismiss the writ of error in such case.

3. While the officials and attorneys and parties to these cases have submitted to file affidavits, they should not perhaps have done so. It is intolerable that a private party should be compelled either to disclose his business affairs to any impertinent intruder, or for his failure, required to answer to a proceeding of this sort. Such inquisitions cannot be tolerated, much less can it be justified that public officials should be required to disclose all of the reasons for their action, and to justify their official conduct by making affidavit to its *bona fides*. If

this principle may be adopted, why may not, upon similar suggestion, the members of this Court be required to make affidavit to their motives and reasons for deciding cases?

Another consideration is that the attorneys are not, and should not be, required to disclose the communications between themselves and clients. They are forbidden to do so even in the administration of justice in the Courts, and it is provided "any attorney offering to give testimony in any of the cases provided for in the two preceding sections, shall be rejected by the Court, and is guilty of a misdemeanor, for which, on conviction, he shall be fined not exceeding $1,000, to be assessed by the jury, and imprisonment not exceeding two years, and, if a practicing attorney, shall also be stricken from the rolls." Shannon's Code, §§ 5785–5787.

The questions propounded by Mr. Trimble were questions that required attorneys to incur the penalties of this Act.

4. It should not be forgotten, in the consideration of this motion, who are these *amici curiæ* who have undertaken to protect the honor and jurisdiction of the Court. It will be remembered that they dismissed their own suits from the Circuit Court at Nashville, and thereby prevented the decision which the Federal Judge, in granting the injunction, had hoped for and invited. They compelled the Western Union Telegraph Company to dismiss its suit, because it was feared that a decision of this Court

Ward v. Alsup.

would prove detrimental to the litigation that the railroads were waging in the 'Federal Court. They thereby prevented the construction of our Constitution and tax laws upon that case.

It will be remembered that it was through agents and attorneys employed at the instance and doing the service of the railroads that the Braid and Kinnaird* cases at Nashville were so far delayed and mangled that this Court could not see its way to advance and hear them during the last term. It should not be forgotten that in all of these cases the railroad companies were given to understand that their counsel would be heard to the fullest extent, and that in both of the cases at bar these very attorneys who seek to intervene have been offered the fullest opportunity to be heard before this Court upon the questions involved.

It is submitted that so far from there being any contempt on the part of the parties and attorneys to these cases, that they have sought the decision of this Court, which alone should construe the Constitution and laws in the first instance, while these *amici curiæ*, if not with contempt, yet with scant respect, have withdrawn their suits and compelled others to withdraw their suits from this Court, in order to prevent a decision of these questions.

BRIEF AND ARGUMENT OF ROSEBOROUGH & JOHNSON
ON THE MERITS:

1. In all cases in which an officer charged by law

---

* These cases have been dismissed as being concluded by the decision in *Ward* v. *Alsup.*—REPORTER.

with the collection of revenue due the State shall take any steps for the collection of same, the party against whom the steps are taken shall, if he conceives the same to be unjust or illegal, or against any clause of the Constitution of the State, pay the same under protest. *Sec.* 1059, *Shannon's Code of Tennessee.*

2. The party paying said revenue may, at any time within thirty days after making said payment, and not longer thereafter, sue the said officer having collected said sum, for the recovery thereof. *Sec.* 1061, *Shannon's Code of Tennessee.*

3. "All property shall be taxed according to its value, that value to be ascertained in such a manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State. No one species of property from which a tax shall be collected shall be taxed higher than any other species of property of the same value." *Art.* 2, *Sec.* 28, *Constitution of Tennessee.*

4. No State shall make or enforce any law which shall deprive any person of his property without due process of law, nor deny to any person within its jurisdiction the "equal protection" of the law. *Constitution of U. S., XIV. Amendment.*

### ARGUMENT.

1. The object in filing this bill was to recover the "State tax" paid to appellee. Said tax was paid under protest and suit brought to recover within

thirty days, as required by law. *Shannon's Code*, §§ 1059–1061.

2. Our contention in a nutshell is, that this assessment is out of proportion to the taxable value at which other species of property in the State is assessed, whereby the property of appellant is made to bear an "undue proportion of burden" of the government, in violation of the Constitution of the State; and that he is also deprived of the "equal protection of the law" under the fourteenth amendment of the Federal Constitution.

3. Appellee, by filing a demurrer, admits all the material facts as set forth in the bill, and especially admits the following:

(a) That the property of appellant and others was assessed at its full cash value.

(b) That the property of all railroads, telegraph and telephone companies, was assessed at less than fifty per cent. of its value.

We earnestly contend, in all seriousness, that when "opposing counsel" make such admissions, they admit their case out of court, for the reason:

(a) That the Constitution of the State of Tennessee says all property shall be taxed according to its value, so that taxes shall be "equal and uniform" throughout the State; that no one species of property shall be taxed higher than any other species of property of the same value.

(b) That it violates the Federal Constitution, which says no person shall be deprived of his property with-

16 P—42

out due process of law, and that all persons within its jurisdiction shall have "equal protection" of the law.

4. Now, the only question for the court to decide is, whether or not the assessment and taxes of appellant are "equal and uniform" with other taxpayers of Tennessee; and whether or not appellant has "equal protection under the law" with the railroad, telegraph, and telephone companies.

5. We contend that the "entire assessment" for 1897, of all property in Tennessee, is null and void, and in violation of the State Constitution.

(*a*) Such violations have been held unconstitutional in other States with Constitutions like that of Tennessee.     62 Ark., 461; 67 Fed. Rep., 411.

(*b*) Under this provision (Art. 2, Sec. 28) of the Tennessee Constitution, "real estate cannot be assessed higher than any other property of the same value (property of corporations) throughout the State." *Taylor* v. *Chandler*, 9 Heis., 349-357; 19 *Fed. Rep.*, 395.

(*c*) Under the constitutional provision requiring that taxes shall be uniform, where the property belonging to individuals in a county has been assessed at less than its actual value; railroad property in the same county must not be assessed at any greater per cent. of its value, and *vice versa.* 68 *Ill.*, 456.

(*d*) A State Constitution declaring that the rule of taxation shall be uniform, requires a uniform

assessment of value; and no tax upon property can be supported which does not proceed upon a valid assessment legally made . upon a uniform rule.

Violations or evasions of duty imposed by law to secure a . just and equal rule of assessment, whether occurring by mistake in law or by fraud in fact, which go to impair the general equality and uniformity of the taxation, vitiates the whole assessment as a foundation of a valid tax. *Marsh* v. *Suprs. of Clark*, 42 Wis., 502; *Philleo* v. *Hills*, 42 Wis., 527.

6. We contend, further, that said assessment was null and void and in violation of the Federal Constitution.

"Opposing counsel" contended with great zeal, in the Court below, that no Federal question was involved in this case.

We submit the following cases to support our position:

(a) It may be that the fourteenth amendment does not in itself secure equality of taxation, but when the laws of a State provide for equality and uniformity of taxation, as does the Constitution, of Tennessee, the fourteenth amendment secures to the citizens the benefit of the constitutional provision. The denial of the right. of equal taxation secured by the Constitution makes a Federal question under the fourteenth amendment. 13 Fed. Rep., 722; 18 Fed. Rep., 385.

(b) It matters not whether the deprivation of this

right results from bad laws or from the unfair administration of laws which are valid; the injury is the same and the amendment can be invoked. *Cummings* v. *Nat. Bank*, 101 U. S., 153; *Ex parte Vir.*, 100 U. S., 347; *Reagan* v. *Far. L. & T. Co.*, 154 U. S., 390; *Pelton* v. *Nat. Bank*, 101 U. S., 143.

7. We admit, for argument sake, that the Act of 1897, under which said assessment was made, is valid and constitutional, but assert that the officers failed to do their duty under said Act. Unintentionally, of course, but the injury is the same; their innocence does not change the result.

We believe that the Board of Equalization, as well as the Assessors, were under this constitutional duty to equalize and make uniform all assessments, and this enactment must be so construed. The Constitution is the "law of the land," and her mandate must be obeyed by the Legislature and all her agents in providing for the execution of the tax system.

(*a*) It is immaterial whether the unequal burden results from the law or from the doings of officers under the law; the injury is the same, and equity will give relief. *Cummings* v. *Nat. Bank*, 101 U. S., 153; *Ex parte Vir.*, 100 U. S., 339; *Reagan* v. *Far. L. & T. Co.*, 154 U. S., 390; *Merrill* v. *Humphrey*, 24 Mich., 170; *Lefferts* v. *Suprs.*, 21 Wis., 688; *Mason* v. *Lancaster*, 4 Bush, 406; *Fuller* v. *Gould*, 20 Vt., 643.

(*b*) "Uniformity in taxing implies equality in the burden of taxation, and this equality of burden can-

not exist without equality in the mode of the assessment as well." *Chattanooga* v. *Railroad Co.*, 7 Lea, 568; *Cummings* v. *National Bank*, 101 U. S., 153; *Stanley* v. *Supervisors*, 121 U. S., 535; *Pelton* v. *National Bank*, 100 U. S., 143; *Boyer* v. *Boyer*, 113 U. S., 689.

(c) If the Board of Equalization was under a duty "to equalize," a mistaken view that such was not its duty could not change the law, and could not render a result legal which would otherwise be illegal. The record shows that said Board of Equalization had knowledge of the great inequality between the assessment of real estate and said corporations for the year 1897, but they purposely and designedly refuse to equalize. Opposing counsel admit the fact, but contend that they were honest, innocent of wrong, and intended no injury. Granting this to be true, we submit to the Court that such a procedure is no justification whatever in law for a wrong result. To illustrate: *A* and *B* go bird hunting. *A* shoots, but misses the bird, and kills *B*. *A's* intention, while honest and innocent, does not change the result with *B*.

8. Opposing counsel in the Court below argued with great force the impossibility of equalizing the assessments of different individuals, and styled it an "iridescent dream." We admit that it is true as to individuals, but that does not meet the case in point. Our contention is that one-third of the property of Tennessee is assessed at less than 50 per cent. of its value,

and the remaining two-thirds assessed at its full cash
value. We contend further that this is not true when
applied to large classes of property and large classes
of individuals. As Judge Clark has said in his recent
famous opinion (*Railroad et al.* v. *Board of Equal-
izers*) that a constitutional and legal inequality in
taxation does not refer to individual hardship, like
the difference in the assessments placed on the prop-
erty of two individuals; nor does it relate to those
differences in value which grow out of mere differ-
ences in opinion; nor does it relate to those in-
equalities which arise by reason of an essential dif-
ference in the kind and use of property with a
proportionate difficulty in getting at the real value.
Inequality in the legal and constitutional sense re-
fers to substantial differences relating to large classes
of property and to the differences in the system or
methods by which such properties are assessed for
taxation.

(*a*) Where a rule or system of valuation is adopted
by those whose duty it is to make the assessment
which is designed to operate unequally, and when
this rule is applied not solely to one individual, but
to a large class of individuals, we are of opinion
that equity will interfere and restrain the operation
of this constitutional exercise of power. *Cummings*
v. *Nat. Bank*, 101 U. S., 157; *Cummings* v. *Nat.
Bank*, 101 U. S., 153; *Pelton* v. *Nat. Bank*, 101
U. S., 143; *Taylor* v. *Chandler*, 9 Heis., 349–357.

(*b*) Mere inequalities in taxation will not vitiate a

Ward v. Alsup.

tax, if they be accidental and unintentional, but a different result follows should a standard of valuation be used for one species of property which is different from that used for another. 19 Fed. Rep., 393.

9. The point was made in the lower Court, but not insisted upon, that appellant had no right to complain, because he had admitted that his property was assessed according to the Constitution of the State—that is, at its full value. In reply, we use the language of Judge Clark: "Such a doctrine is neither sound in law nor morals, and is so monstrous as to be indefensible by fair argument."

10. Appellant had the right to appear and make complaint before the Board of Equalization, but it would have been a waste of time for the reason that a constitutional question was involved, and he preferred to submit his rights to the Court.

The right to appear before a Board of Equalization, under the statute, is not exclusive of the right to have relief by proceedings in equity. *Cin. St. Ry.* v. *Guenther*, 19 Fed. Rep., 395; *Benn* v. *Chehalis*, 39 Pac. Rep., 365; *Bank* v. *Hungate*, 62 Fed. Rep., 548.

11. To further show the illegality of said assessment of 1897, we submit that the law of 1895 provided for a supreme advisory Board of Equalizers, but under the law of 1897, no such board was provided. We must admit that under the law of 1895, the Railroad Assessors did have the right to assess railroads, telegraph, and telephone properties, except

for the year 1897, which right was given them under Sections 60–64, Chapter 120; but the Legislature of 1897, Chapter 7, repealed all authority to assess such property, in the same Act abolishing the office of Railroad Assessors. A Board of Commissioners to deal with and govern railroads, telegraph, and telephone companies was authorized under Chapter 10, Acts of 1897, but the authority that the said Commissioners would have had to assess railroad, telegraph, and telephone property under Chapter 120 of the Acts of 1895 (as Chapter 10 of the Acts of 1897 was simply amendatory to the Acts of 1895), was repealed *in toto* by Chapter 7, Acts of 1897, above referred to. Thus, when Sections 60–64, of Chapter 120 of the Acts of 1895 were repealed, all right to assess said property was gone, hence, the assessment of 1897, under the Acts of 1897, is without authority and void.

Thus this great class of property can and will escape taxation for the year 1898, and the burdens of government must fall on the other great class of taxable property, which is in direct conflict with Art. 2, Sec. 28, Constitution of Tennessee, which guarantees that all taxation throughout the State shall be equal and uniform. 19 Fed. Rep., 395; 62 Ark., 461; 67 Ark., 411.

12. We have now come to the Act passed at the special session of the Legislature on February 1, 1898, the caption of which is as follows:

"A bill, to be entitled an Act to ratify and

confirm the authority of the persons appointed as Railroad Commissioners under Chapter 10 of the Acts of 1897, and acting as *ex officio* State Tax Assessors under Chapter 5 of the Acts of 1897, to make the assessments of railroad, telegraph and telephone properties for taxation for the years 1897 and 1898, and enacting that said persons shall be deemed and held to have had and possessed all authority and jurisdiction conferred, or sought to be conferred by said Act, Chapter 5 of the Acts of 1897, upon the State Tax Assessors, and to have been legally appointed as such Assessors.

(*a*) This Act does not cure the want of authority under the law of 1897 to assess railroad, telegraph and telephone properties, because said Act, standing alone, would be meaningless, for it is too vague, and does not of itself give the Commissioners a right to assess.

(*b*) It simply reaffirms the authority of the Railroad Commissioners as *ex officio* assessors of railroad, telegraph and telephone properties under Chapter 5 of the Acts of 1897.

(*c*) As Chapter 5 of the Acts of 1897 does not give the Railroad Commissioners a right to assess, then to "ratify and confirm" Chapter 5 of the Acts of 1897 does not clothe the Commissioners with any authority, except the authority given under Chapter 5 of the Acts of 1897.

(*d*) The curative Act of 1898 does not cure, but

is in its nature simply an indorsement of the acts of the Board of Railroad Commissioners.

13. The learned Chancellor held, in sustaining the demurrer of appellee, that to rule otherwise would bankrupt the State of Tennessee. We think not, for the reason that the taxes for 1897 have already been paid. They were not paid under protest. Suit was not brought within thirty days. Hence all taxpayers are barred by the statute of limitation so far as 1897 is concerned. What will be the result for 1898, time alone can answer. We simply suggest that "now is the accepted time," and it behooves this Court to act promptly and fearlessly before financial disaster is thrust upon us. But granting that the learned Chancellor was correct, we say, with all due respect, that it is not the duty of the Courts to provide and secure the finances of the State, but it is the solemn and sworn duty of the Courts to uphold the Constitutions of the State and Union, and enforce the law. We cannot afford to infringe or tamper with the foundation stone of government. Such a precedent would be suicidal.

14. The State of Tennessee wants no money raised by injustice. She is entitled to so much revenue and no more. It is immaterial to the State whether the amount to which it is entitled be raised upon high assessments and low rates, or by high rates upon low assessments. But it is vital to the taxpayers, whether the one or the other system be adopted, that the burden be equal and uniform. An assess-

Ward *v.* Alsup.

ment of properties otherwise would be unjust, illegal, and unfair. When assessors fail or refuse to equalize, the Courts must and will equalize for them. All that appellant asks in the premises is, that his rights be protected under the Constitution of Tennsssee.

### BRIEF AND ARGUMENT OF ATTORNEY-GENERAL PICKLE ON THE MERITS.

#### I.   STATEMENT OF CASE.

These cases stand on appeal from dismissals upon demurrer, and involve identical questions. In each case a taxpayer seeks to recover, of the County Trustee, State taxes on real estate and personalty for the year 1897, which have been paid under protest. The pay-under-protest statute makes a suit of this character the taxpayer's sole remedy for any injustice that may result to him from the operation of revenue laws in other respects than as to mere matters of valuation, and, in express terms, forbids any resort to injunction, supersedeas, or other like remedies. Code, § 1059 *et seq.* (S.).

The Courts have vindicated not only the validity of this statute, but its sound policy and necessity.

In *Tennessee* v. *Sneed*, 96 U. S., 69, the Supreme Court of the United States, speaking of this Tennessee statute, said: "This remedy is simple and effective. A suit at law to recover money unlawfully exacted is as speedy, as easily tried, and less complicated than a proceeding by mandamus. Every

attorney knows how to carry on the former, while many would be embarrassed by the forms of the latter. Provision is also made for prompt payment of the amount by the State, if judgment is rendered against the officer on the merits. . .. . It requires the contestant to pay the amount as fixed by the government, and gives him power to sue the Collector, and, in such suit, to test the legality of the tax. There is nothing illegal or even harsh in this. It is a wise and reasonable precaution for the security of the government, and no government could exist that permitted the collection of its revenues to be delayed by every litigious man, or every embarrassed man, to whom delay was more important than the payment of costs.''

The Federal Government has a similar statute. Inasmuch as the taxpayer is forbidden to pursue any other remedy than that provided by the statute, it would seem that he should be entitled to make all questions in a suit of this character which are available under any circumstances to impeach the validity of the tax. It is conceded that such is his right. Possibly there may be cases in which the taxpayer, notwithstanding this statute, may resort to a Court of Equity upon some special ground for equitable interference, such as the prevention of a multiplicity of suits, cloud on title, fraud, etc. But his failure to go into equity does not, and should not, prejudice his rights, if he chooses to pursue this statutory remedy.

These taxpayers, therefore, stand upon the same plane with taxpayers who may have resorted to injunction or other equitable remedy. The pertinent facts upon which these taxpayers base their claim to recover back their State taxes for 1897, in whole or in part, are these:

They aver that all property, including their own, except railroad, telegraph, and telephone property, was taxed for the year 1897 at its fair cash value, while railroad, telegraph, and telephone properties were either not taxed at all, or, if taxed, they were assessed upon some basis or per cent. less than their true value. They aver, further, that the real estate and personalty assessed in the State for 1897, at its fair cash value, amounted to $300,000,000, and that railroad, telegraph, and telephone properties, that either wholly escaped taxation for that year or were undervalued, amounted to $100,000,000. They assail the system of taxation under which assessments were made for the year 1897, as being unconstitutional and void. The objections urged against this system are:

1. That said system necessitates, invites, and permits inequality in taxation, by providing for the assessment of different classes of property by different and varying methods—that is to say, real estate and other property as one class, and railroad, telegraph, and telephone properties as another class, by distinct and independent Assessors and Boards of Assessors, the former by local County Assessors,

and the latter by State Boards, and without any common supervising superior, and without any uniform, mandatory rule enjoining equality.

2. Because said system wholly failed to provide for the assessment of railroad, telegraph and telephone properties for 1897, and as a consequence the properties of these companies, valued at $100,-000,000, has escaped, or may escape taxation for said year.

It is contended in this connection that the Assessment Act of 1895, did not authorize the assessment of railroads, etc., for 1897, which was attempted to be made thereunder in 1896, and that the Railroad Assessment Act of 1897, failed to provide for an assessment of such properties for that year. It is further contended that the curative Act of the Extra Session of 1898 did not obviate this difficulty. But assuming the validity of the system of taxation and of the assessments of railroad, telegraph, and telephone property for 1897, still it is contended that the assessment of said properties is disproportionate and unequal; that is to say, if the assessment made in 1896 for the year 1897 be held valid, the valuations thereunder were only 50 per cent. of true value, and if the assessment for 1897, made in 1897, shall be sustained, then the valuations were only 75 per cent. of real values.

As a result, these complaining taxpayers contend

that their taxes should be abated to the same level, and that they should recover accordingly.

It is further averred that the State Board of Assessors of Railroads, etc., who, under the Act of 1895, were likewise equalizers of the assessments of real estate, did equalize real estate for that year at seventy-five per cent. of its value, leaving a large class of real estate, to wit : the real estate of Crockett County, including the plaintiff's, assessed at its full value. It is averred that the assessment or equalization at seventy-five per cent. was intentional, but that the Assessors did not act fraudulently in any respect.

It is further averred that there is no statute authorizing back assessment of railroad, telephone, and telegraph properties for 1897. There is likewise an averment that the Board of Assessors who equalized the assessments of real estate for 1896 and 1897, and assessed the railroads, etc., of that year, valued the railroad, telephone and telegraph properties at less than the seventy-five per cent. basis upon which real estate was equalized.

These are the material allegations upon which relief is sought.

The demurrers, which were sustained, affirmed the validity of the system of taxation and the validity of the assessments of railroad, telegraph, and telephone properties for 1897, and denied that the complaining taxpayers were entitled to relief upon their showing that they had not been assessed above the

constitutional and statutory standard of actual value, although other properties may have been assessed by other assessors below that standard.

The demurrers likewise affirmed that the statutes providing for equalization and back-assessments of properties omitted or inadequately assessed, afforded a remedy, and the only remedy, available for inequalities or irregularities of this character.

## II. CONSTITUTIONAL LIMITATIONS UPON THE TAXING POWER.

The Constitution of Tennessee imposes these restrictions upon the exercise of the otherwise unlimited power of taxation:

(1) That all property shall be taxed, thereby defeating the power to create exemptions other than in the excepted cases;

(2) That the rate of taxation shall be uniform, thereby denying to the Legislature the power to create classes of property and to tax the classes at different rates.

"No one species [class] of property from which a tax may be collected shall be taxed higher than any other species [class] of property of the same value."

(3) That taxation shall be imposed upon property "according to its value"—that is, at its value, or at its full value;

(4) That the Legislature shall not, in prescribing the methods of assessment, or of ascertaining value

for taxation, adopt rules that will necessarily produce inequality in the apportionment of the public burdens. Within the limitation that they shall not necessarily produce inequality, the Legislature is left the fullest discretion to provide methods for the ascertainment of value.

It is essential to ascertain the exact limitations resting upon the taxing power under the Constitution before proceeding to discuss the system of taxation and the acts of officers under it.

It should not be forgotten that, without any Constitutional provision on the subject, the Legislature has unlimited power over the subject of taxation. It may tax, or refuse to tax. It may tax some and exempt other persons or property. It may tax classes of persons and property, and perhaps individuals, at different rates. It may fix value, or any other standard it may choose, as a standard for apportionment of the burdens of taxation. It may create any inequalities it chooses in the matter of taxation. *Chattanooga* v. *Railroad*, 7 Lea, 566.

Tennessee has had three Constitutions, to wit: 1796, 1834, and 1870. The first (1796) contained few limitations upon the taxing power and these related alone to real estate and poll taxes.

The provision was in these words: "All lands liable to taxation in this State held by deed, grant, or entry, shall be taxed equally and uniform, in such manner that no 100 acres shall be taxed higher than another, except town lots, which shall not be taxed

16 P—43

higher than 200 acres of land each. No freeman shall be taxed higher than 100 acres, and no slave higher than 200 acres on each poll." Const. 1796, Art. I., Sec. 26. The standard of taxation was the 100 acres of land under this Constitution.

The Constitution of 1834 imposed additional and more stringent limitations upon the taxing power. Its provisions were substantially the same as those contained in the Constitution of 1870, except that the former did not require all property to be taxed. Const. 1834, Art. II., Par. 28; *Memphis* v. *Bank*, 91 Tenn., 574; *Railroad* v. *Hicks*, 9 Bax., 442.

The abuse of legislative power under this Constitution in granting exemptions from taxation to railroads and other corporations, caused the Constitutional Convention of 1870 to give the screw another turn.

The Constitution of 1870 provided: "All property, real, personal, and mixed, shall be taxed. . . . All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value. The Legislature shall have the power to levy a tax upon incomes derived from stocks and bonds that are not taxed *ad valorem*." Constitution 1870, Art. II., Sec. 28.

That all property other than the special exemptions must be taxed under the Constitution of 1870

admits of no question. *Memphis* v. *Bank*, 91 Tenn.,
574; *Railroad* v. *County*, 87 Tenn.; *Railroad* v.
*Gaines*, 3 Tenn. Ch., 608.

That the rate of taxation must, under this con-
stitutional provision, be uniform upon persons and
property admits of no controversy.

The power to classify and impose different rates
on the several classes is clearly taken from the
Legislature.

Until a very recent date few persons, if any, could
have been found who would have asserted that,
"according to its value" had any other meaning than
"at its value" or "at all of its value." Such
was clearly understood to be its meaning in the Con-
stitution of 1834.

In *Brown* v. *Greer*, 3 Head, 696, decided in 1859,
Judge Caruthers, commenting upon the fact that cer-
tain slaves had not been "assessed at much more than
half their value," uses this strong language:

"The Constitution and statutes to which the As-
sessors are sworn to conform, required that 'prop-
erty should be assessed according to its value.' In
this case, from the description of slaves, it is clear
that they are not assessed at much more than half
their cash value. It is a great abuse, and ought to
be reformed. All property ought to be assessed at its
fair value, and that can only be determined by the
ordinary selling and buying prices for cash at the
time. To place it any lower than this standard is
a palpable dereliction of duty on the part of those

whose duty it is made by law to value it, and it is difficult to see how the district or town assessors can reconcile their practice in this respect to their duty, enforced by a solemn oath.    The fault is not that of the taxpayer, but of the Tax Assessor, as it is not the duty of the former but the latter to fix the value of property."

The fact that this utterance is an *obiter dictum* does not impair its value as evidence of the meaning of the phrase " according to its value," as used in the Constitution of the State.

Judge Caruthers was a great and accurate Judge. His testimony is of great value on this point.    His emphatic utterance has never been disputed, or even questioned.

The framers of the Constitution of 1870 retained the phrase in the new instrument with the fullest knowledge of this, then the only judicial interpretation of its meaning.

There were many able lawyers in the Convention of 1870, and it will not be presumed they were ignorant of this utterance of Judge Caruthers, or intended to retain said phrase precisely as it stood in the Constitution of 1834, and give it a different meaning. It has been uniformly assumed, because never questioned, in all the cases decided under the Constitution of 1870 at all involving the question, that "according to its value" retained the definition given to it by Judge Caruthers.

In *Chattanooga* v. *Railroad*, 7 Lea, 569, the con-

struction of this clause of the Constitution of 1870 was directly involved and undertaken by the Court.

In that case is found these utterances: "The principle of the Constitution is, that all property taxed at all, shall be taxed at all its value. . . . The Constitution has emphatically declared that all property shall be taxed, and that it shall be taxed at its value. . . . We need scarcely say that value must mean the worth of the property, as compared with the money of the country, the standard by which all values are regulated."

In *State* v. *Butler*, 11 Lea, it is said: "But it is not competent for the Legislature to prescribe a rule for the reduction of assessments, which will violate the manifest object of the fundamental law. That object is, that the property must be taxed at its value, at the time the tax is imposed."

In *Street Railway* v. *Morrow*, 87 Tenn., 415, the Court said: "The Constitution and laws prescribe that all property shall be assessed according to its value, and if, by the misfeasance, nonfeasance, or mistake of the Assessor, it is not assessed according to its value, but upon an arbitrary basis fixed by the Assessor, at far less than its value, why should the tax debtor escape?" etc.

In *Ellis* v. *Railroad Co.*, 55 Tenn., 531, Judge McFarland said: "The provisions of the first ten sections of the Act of March 24, 1875, provide for ascertaining the value, as required by the Constitu-

tion, to the end that it be taxed according to its value."

The Act of 1875, referred to, requires the Assessors to ascertain the total value of the property.

In *Jenkins* v. *Irvin*, 8 Heis., 458, it is said: "The provisions of the Constitution impose an absolute and imperative inhibition upon the Legislature, requiring it, in taxing property, to provide that it be taxed according to value, but expressly excepting from the inhibition the manner of ascertaining the value."

Whether these judicial statements can be regarded as decisions or not, they are convincing and conclusive evidence of the understanding of the judiciary and of the framers of the Constitution, as to the meaning of this phrase. Added to this is the legislative interpretation from time immemorial.

Numerous assessment statutes have been passed in Tennessee since 1834, and not one of them ever provided for assessment at other than the fair value of property. Each assessment Act contains direction for assessment at value, and usually prescribes the mode of ascertaining the cash value of the property.

The methods have differed as to different kinds of property or at different dates, but the object sought in every instance was actual or fair value. Methods might well differ, and justice might demand that they should, in order to adapt them to the times and the property. Moreover, the plain and obvious meaning of the term, "according to its value," is according

Ward *v.* Alsup.

or agreeable to its value or worth. The language must be cruelly tortured to make it mean, "according to a per cent. of its value," either above or below the standard of real value.

If the term shall be degraded from the dignity of a limitation having force and meaning, to a mere datum, then, the Legislature may as lawfully assume some per cent., as five, ten, one hundred, or one thousand per cent. *above* the true value, as fifty, twenty, or any other per cent. of true value. This shows the absurdity of the contention. But, as value is the usual, almost universal, basis of assessment, the one that is best understood and most practicable in its application, why should the constitution makers desire to fix any other or leave that matter open for cavil?

Under the Constitution of New Jersey, which provides that property shall be taxed "according to its true value," it is held that the Legislature cannot provide for assessment of property at other than its "true value." *Williams* v. *Bettle*, 51 N. J. L., 512.

There is no difference between the "value" and the "true value" of a watch, horse or other property. There is no substantial distinction between the Constitutions of Tennessee and New Jersey in this particular.

The Illinois Supreme Court, construing a statute requiring property to be assessed at "its fair cash value," said: "This is nothing more than what

the law would require without it, for a simple, un-
qualified direction to value property, by its very
terms, imposes the duty of ascertaining and declaring
its cash value." *Railroad* v. *Stookey*, 122 Ill., 358.

In Alabama the Constitution provides that prop-
erty "shall be assessed in exact proportion to the
value of such property." The Supreme Court of
that State declaring a statute void which provided
an arbitrary basis for assessment, other than value,
said: "The limitation would be in vain, if the Leg-
islature could prescribe a standard of value." *As-
sessor* v. *Railroad Co.*, 59 Ala., 551.

Other cases could be cited, but these should suffice.

The attorneys for the railroads, in their brief
(p. 101) before the Circuit Court of Appeals, in the
L. & N. case, make the statement that it "was
definitely settled in 1896 by the Supreme Court of
Tennessee" that "according to its value" does not
mean at fair value, or at full value, but that it is
a mere datum for fixing per cent. of value. The
Reelfoot Lake case is cited and quoted for this prop-
osition. 95 Tenn., 161. The language quoted does
not sustain the contention, and counsel seem to have
overlooked the fact that the very cases now quoted
and relied upon by appellees were cited and approved
in that opinion. 8 Heis., 478; 7 Lea, 561; 87
Tenn., 406. That case did not involve the question
now under consideration. It simply held that a spe-
cial assessment for a levee was a tax that could not
be laid by the acre.

The case of *Ex parte Bridge Co.*, 62 Ark., 461, is not authority for appellants' construction. The Constitution of Arkansas is identical with that of Tennessee in this particular. The Supreme Court did not decide but reserved the constitutional question in that case.

The standard of assessment for taxation under our Constitution, is, therefore, the "value," or "true value," or "correct value," or "cash value," or "fair value" (for all these terms convey the same idea) of the property. The Legislature is limited to this standard in providing methods for ascertainment of value. No official can depart from it without violating the Constitution and his oath. This standard fixed, becomes a pole star for the Legislature in determining methods for valuation of property. This standard is not only entirely consistent with, but promotive of uniformity and equality. What standard is more simple, better understood, or easy of application than actual value? What can be more confusing than a standard based upon a per cent. above or below value? Both these limitations, the one prescribing actual value as the standard of assessment and the other prescribing the rule of equality and uniformity, readily stand together and aid each other.

The Supreme Court of Ohio has best expressed this thought: "A faithful execution of the different provisions of the statutes would place upon the duplicate for taxation all the taxable property of the

State, whether bank stocks or other personal prop-
erty, or real estate, according to its true value in
money; and the equality required by the Constitution
has no other test.     There is nothing in the Consti-
tution which requires property to be texed according
to some per cent. of its true value in money, save
only the one hundred per cent.'' *Wagoner* v. *Loomis*,
37 Ohio, 580.

There is no ''Aaron's rod'' among the mandates
of the Constitution.    The requirement as to equality
and uniformity will no more be permitted to over-
rule or swallow up the mandate as to assessment at
value, than the latter will be permitted to destroy
the former.    Both are consistent and helpful of each
other, and both must stand.    Equality must be
effected on the plane of value.

It will be observed that the equality and uni-
formity requirement is a limitation upon the exercise
of legislative discretion in providing methods for
assessment or for ascertainment of value.    This re-
quirement is spoken of in the briefs in the railroad
cases, as if it were the whole thing, and as if all other
provisions of the Constitution must yield to it.    It
has no more force, certainly, than the other positive
limitations of the Constitution, and must, if possible,
be construed consistently with them.    The only effect
of this provision is to prevent the Legislature from
adopting methods of assessment that necessarily pro-
duce inequalities.    This clause is not violated, even
if the very best methods are not adopted, or if in-

equalities may, and probably will, result from the methods prescribed. Before a statute will be declared unconstitutional, it must appear, beyond reasonable doubt, that conflict with the fundamental law cannot be avoided. *Henley case*, 98 Tenn.

It is a mistake to assume that appellees' cases depend upon the correctness of their contention that the Constitution requires assessments to be made at standard of actual value. Even if appellants' contention is correct in this particular, the Legislature had the undoubted power to fix actual value as the standard for assessments, and it has done so. The statutory rule as effectually binds and controls officers and citizens as a constitutional rule. However, it is important to ascertain the exact limitations of the Constitution before considering other matters. If the Constitution has spoken, then citizens, legislators, and Courts must obey the command.

It will not be contended, in the teeth of a plain constitutional provision, that Assessors should have made assessments below actual value because of some custom or of the act of some delinquent Assessor of other property. It will scarcely be contended that the Legislature ought or could provide for equalization of assessments on a plane above or below the constitutional standard of actual value. Courts will hardly undertake to abate assessments conforming to every requirement of the Constitution to equalize them with assessments made by other officers in violation of their oath and the Constitution. Courts will be

slow to break down the bulwarks of the Constitution and to say to faithful public officials that it is their duty to look away from the Constitution for some unlawful custom, and follow the latter in disregard of the former.

### III. SYSTEM OF TAXATION.

The system of taxation under which the taxes for the year 1897 were levied and assessed is not invalid for any of the reasons urged against it.

It is not essential to the validity of a system of taxation that it should be perfect, or even the very best. Mere vices do not vitiate the system. The State does not guarantee absolutely correct results from the operation of its tax laws, any more than it guarantees the honesty of all its citizens and officials. It is sufficient if the laws do not necessitate inequalities. The Legislature, subject to this limitation, has full discretion as to modes, means, and agencies for assessments.

"Any mode of ascertaining the value of property may be prescribed that *tends* to reach the result required, such as," etc. *Franklin County* v. *Railroad*, 12 Lea, 535 *;* *Chattanooga* v. *Railroad*, 7 Lea, 566.

The objections to the system will now be noticed:

1. The objection put forward most prominently is that the system "necessitates, invites, and promotes inequalities in taxation by providing for the assessment of different classes of property by different and

varying methods—that is to say, real estate and other property as one class, and railroad, telegraph, and telephone properties as another class, by distinct and independent Assessors and Boards of Assessors, the former by local County Assessors and the latter by State Boards, and without any common supervising superior, and without any uniform, mandatory rule enjoining equality.''

The system attacked is one hoary with age in Tennessee. Under this system all the taxes, except those of 1895 and 1896, that have supported the State government for more than half a century, have been collected. The same system exists · in ' many States. It may not be the very best system. Doubtless it is susceptible of improvement. But is it utterly void? That is the question for . consideration here. Since no single Assessor or Board of Assessors can assess all the property in a State or other large territory, it will always be necessary to assess taxes under a system substantially the same as that existing in this State. There never has been a general supervising Equalization Board in this State, except that, under Act of 1895, the Railroad Tax Assessors were authorized to equalize assessments of real estate among the counties, there has been no such board in this State. That board had jurisdiction of real estate only, and no power to equalize among individuals. Its life was short and its end tragic. Although there have been more than ninety counties, with as many independent assessments, there has

been no board, except that of 1895–96, to equalize among the counties.

Since 1875 the railroads have been assessed by a distinct State board, and there has been no general supervising board to equalize railroad assessments with those made in the counties, but only among themselves. The Act of 1897 makes no provision on this subject, and is in line in this respect with all former Acts, except that of 1895, and the latter Act made provision for real estate only.

It is not enough to invalidate a system that it may invite or promote inequalities; the rule is, that it must necessitate them. The conflict of the law with the Constitution must be necessary and inevitable before the law will be declared void.

It is not .necessary there should be a '' common supervising superior '' to rescue a tax system from fatal objection. This entire subject was put at rest in 1879, by the Supreme Court of the United States, in passing upon the Ohio system in the case of *Cummings* v. *Bank*, 101 U. S., 153.

To the very objections now made to the Tennessee system, Mr. Justice Miller made this reply in the Ohio case :

'' But there are two reasons why we cannot so hold. First, it might be that in every instance the result would be the valuation of bank shares at a lower rate, in proportion to its real value, than that of any other property, and, therefore, plaintiff would have no ground of complaint ; and, secondly, what

is more important, if these original valuations and
equalizations are based always, as the Constitution re-
quires, on the actual money value of the property
assessed, the result, except as it might be affected by
honest mistakes of judgment, would necessarily be
equality and uniformity, so far as it is attainable.

"So that, while it may be true that this system
of submitting the different kinds of property subject to
taxation to different Boards of Assessors and Equal-
izers, with no common superior to secure uniformity
of the whole, may give opportunity for maladminis-
tration of the law and violation of the principle of
uniformity of taxation and equality of burden, that
is not the necessary result of these laws, or any one
of them ; and · a law cannot be held unconstitutional,
because, while its just interpretation is consistent with
the Constitution, it is unfaithfully administered by those
who are charged with its execution. Their doings may
be unlawful, while the statute is valid."

This Court has recognized the same principle.
*Chattanooga* v. *Railroad*, 7 Lea, 573, 574, 578 ;
*Franklin County* v. *Railroad*, 12 Lea, 535–6, 539–40.

And the Legislature may prescribe such methods,
within proper limitation, as it deems best calculated
to ascertain the value of any particular class of prop-
erty, though such methods may not be identical with
those prescribed for other classes, *e. g.*, one method
for railroads and another for real estate. Indeed,
such differences in methods are sometimes demanded
by the different nature and situation of the different

properties.    In addition to citations in above para-
graph, see 13 Am. & Eng. R. Cases, 248 ; 41 *Id.*,
589.

Of course these methods must not violate any funda-
mental rule of the Constitution.

The contention made in this connection, that the
several independent boards are not only without any
"common supervising superior," but also "without
any uniform mandatory rule enjoining equality," is
unfounded in fact.    The Constitution gives to all tax
officials the same mandate: "Assess all property at
all of its value."    If all officials obey this mandate
as they are sworn to do, equality is the necessary
result.    The statutes speak the same words to every
tax assessor or board, and this is sufficient, if the
Constitution had not spoken at all on the subject.
The mandate of a valid statute is as potent as re-
gards citizens and officials as the mandate of a Con-
stitution.    Both must be alike obeyed.    While com-
mon taxpayers make complaint of the system in this
case, the railroad companies have made like complaint
in other cases.    If the system is open to constitu-
tional objection from any point of view, either that
of the common taxpayer or that of the railroads, then,
of course, it must be void *in toto*.

The railroad companies, in their brief before the
Circuit Court of Appeals, make certain specific objec-
tions to this system, which, it is insisted, invalidates
the whole.    Their first objection is that they are not

afforded equal opportunities for equalization with the common taxpayers.

An examination of the statutes will convince any impartial mind that there is no ground for complaint on the part of the railroads on this score. While there is no general supervising or equalizing board, all the assessors proceed by the same methods and to ascertain the same thing—the value of the property. While common taxpayers get equalization by a board within each County, they get no general equalization with other Counties or with railroads.

Railroads get the opinion of two boards, composed of six persons. They have ten days to except and to file additional evidence, after the first board has acted, and then a hearing before that board. The State cannot even rebut the evidence adduced during this ten day interval.

Then they are entitled to another hearing before the higher or appellate board, and this board may re-commit the assessments to the Assessors for additional evidence, if they deem proper.

These methods of equalization are not identical in both cases, and cannot be, but they are both adapted to the property to be assessed.

What further hearing could be of advantage to either class?

This contention can be most effectually answered by the language of the Supreme Court of the United States in the *Backus case*, 154 U. S., 421–438:

"Equally fallacious is the contention that because

16 P—44

to the ordinary taxpayer there is allowed not merely one hearing before the county officials, but also a right of appeal, with a second hearing before the State Board, while only one hearing before the latter board is given to railroad companies in respect to their property, therefore the latter are denied the equal protection of the laws. If a single hearing is not due process, doubling it will not make it so, and the power of a State to make classifications in judicial or administrative proceedings carries with it the right to make such classification as will give to parties belonging to one class two hearings before their rights are finally determined, and to parties belonging to a different class only a single hearing.''

Again : '' Rehearings and new trials are not essential to due process of law, either in judicial or administrative proceedings. One hearing, if ample, before judgment, satisfies the demand of the Constitution in this respect.'' See, also, *Marsh* v. *Arizona,* 164 U. S., 600.

Another point made against the validity of this system in the brief of counsel for railroads (p. 126) is that the general assessment Act of 1897 prescribes different standards or bases for making valuations. It is said the former prescribes '' actual cash value,'' and the latter '' correct value of such property,'' and that these are different standards. With all due respect, this seems the merest quibble upon words.

Mr. Justice Miller has answered this contention in *Cummings* v. *Bank,* 101 U. S., 153–164, in these

words: ''The Constitutions and statutes of nearly all the States have enactments designed to compel uniformity of taxation and assessments at the actual value of all property liable to be taxed. The phrases 'salable value,' 'actual value,' 'cash value,' and others used in directions to assessing officers, all mean the same thing, and are designed to effect the same purpose.''

Can it be supposed that an Assessor directed to obtain ''actual cash value'' would get other than the ''correct value'' of property?

2. Another objection to the system, affecting its validity as regards the taxes of 1897 at least, is that our taxing laws, taken as a whole, have failed to provide for either the original or back assessment of the railroads for the year 1897, thereby exempting one-fourth of the property of the State from taxation for that year.

Undoubtedly a statute or several statutes constituting a system that operated to exempt $100,000,-000, or one-fourth the entire property of the State, from taxation, while imposing burdens upon other property, would be void under a Constitution like ours. It becomes, therefore, a pertinent and serious inquiry whether the statutes do operate to create this exemption.

While two assessments of railroad, telegraph, and telephone properties for 1897 were, in form, made, it happens that the validity of both is seriously questioned. If either of these assessments was au-

thorized, then this attack upon the system must fail, though the assessment itself may be open to attack for other causes.

These assessments will be examined in their order:

(a) *Assessment made in 1896 for 1896 and 1897.*

This assessment was made by the board appointed and acting under Acts 1895, Ch. 120, Sec. 60, *et seq.* It was made in 1896, not only for that year, but also for 1897. This assessment was probably made without authority. The board had no authority to make a biennial assessment in 1896, and therefore no authority to assess at that time for 1897. The Act was repealed and the board abolished before time for assessment in 1897. The Act of 1895, which was passed May 14, 1895, provided for the appointment of a State Board for assessment of railroads, etc. They were authorized to "assess only the distributable property of railroads and telegraph companies for the year 1895." (Par. 60.)

Then follows this provision as to their subsequent action: "That it shall be the duty of said board to assess the distributable and localized property of all railroad, telegraph, and telephone companies for the year 1896, and after that biennially. . . . The schedules of distributable property for 1896, and thereafter biennially, are to be filed with the Comptroller on or before the second Monday in January of the year for which the assessment is made." (Par. 61.)

It will be observed that their jurisdiction was extended for 1896 to localized property and to telephone companies. The assessment to be made in 1896 was expressly "for the year 1896," and for no other period, "and after that biennially."

The direction of this Act is clearly that annual assessments shall be made for the years 1895 and 1896, and in those years respectively, and after that time the assessments should be made for terms of two years, beginning with 1897. The other provisions of the Act sustain this construction. But this is unimportant, as this assessment was unquestionably abrogated by subsequent legislation. Nor is an assessment of property for taxation such a "right accrued," or "duty imposed," or "penalty incurred," or "proceeding commenced," as will be saved to the taxpayer upon repeal of the statute under which assessment has been made. A complete, valid assessment might be saved to the State upon such repeal, for it has in such case a "right accrued," and there is a "duty imposed" on the taxpayer in favor of the State, and there is a "proceeding commenced," upon which the State might insist. The direction to make a new assessment of necessity abrogates any former one.

The right of the State to reassess or back assess, is thus vindicated by Judge Lurton, in *Street Railway Co.* v. *Morrow*, 87 Tenn., 415: "The Constitution and laws prescribe that all property should be assessed according to its value, and if, by the mis-

feasance, nonfeasance, or mistake of the Assessor, it is not assessed according to its value, but upon an arbitrary basis, fixed by the Assessor, at far less than its value, why should the tax debtor escape, simply because he has made payment? . . . It may be that such a law will work inconvenience and annoyance to the citizens, but all tax laws are odious and vexatious. It is said the citizen ought to know when he is through with the taxgatherer, but he will know when he has paid his taxes on his property according to its value. He will know then he is secure against reassessment, and the law will protect him.''

This assessment of 1896 was a confessedly inadequate one, and was made by a board whose acts had been condemned at that time by every department of the State government except the Legislature, and the latter proceeded with commendable alacrity to abolish this board, on their assembling in 1897. *Harris v. State*, 96 Tenn., 504; Acts 1897, Ch. ——.

(*b*) *Asssessment for 1897 made in 1897 for 1897–98.*

This assessment was made in 1897 by the new Board, appointed under Act of 1897, and pursuant to that Act. Acts 1897, Ch. ——. It is assailed by the railroads as having been made without authority, and if their contention is true in this particular, the statutes have failed to provide for any original assessment of these properties for 1897.

When it is remembered that the former board had

caused great dissatisfaction and had drawn upon themselves much condemnation for their inefficiency in the assessment of railroads, etc., for 1895 and 1896, and that the Legislature of 1897, with precipitate haste, abolished that board before they could possibly commence assessments for 1897, it is easy to understand that the Act of 1897 was designed to confer power upon the new board to assess for that year.

The language and provisions of the Act leave no doubt about this matter. The Act became a law April 30, 1897, and before any act looking to the assessment of the roads for that year was to be done by the board. Their first meeting and organization occurs under the Act on the first Monday in May. The first board is to be appointed under this Act "on or before the first Monday in May, 1897." Sec. 1.

They are to receive from the Comptroller the schedules filed with him by the railroads, "immediately upon their organization," "and they shall immediately proceed," etc. The railroads and other companies are required to file schedules "on or before the first day of May, 1897, and biennially thereafter, on or before said. date." Par. 2.

And, finally, and it would seem, conclusively, the Act provides: "That said assessments shall be made biennially, beginning with the year 1897." "Biennially" as here used evidently means "for terms of two years." Can there be any doubt but that an assessment under this Act for 1897, was

intended and actually provided for? It has been the unbroken custom in Tennessee to assess under each assessment Act for the year in which it was passed, and that, too, when it was passed inconveniently late in the year. And assessment Acts have uniformly been treated as abrogating all assessments made for the current year of their passage, unless therein expressly reserved. Hence, the general assessment Act of 1897 expressly provides that assessment of real estate made in 1896, for both 1896 and 1897, shall remain in force. Acts 1897, Ch. 1, Par. 28. Why was no such provision made for saving railroad assessments?

A case in point occurred in 1877. Under the Act of 1875, assessments of real estate had been made for four years. In 1877 a new assessment Act was passed, but it did not, in terms, repeal the existing assessment. The latter Act was passed over the Governor's veto, calling attention to the existing assessment as one of his reasons for the veto. Nevertheless, the effect of the Act was to abrogate the existing assessment by implication, and a new assessment was made.

### (c)  Curative Act.

But this question is settled and obviated by a curative Act passed at the Extra Session of 1898, to put the doubts as to the validity of the assessment for 1897 at rest. The Act is in these words :

"SECTION 1. *Be it enacted by the General Assembly*

*of the State of Tennessee,* That the authority of the persons appointed as Railroad Commissioners under Chapter 10 of the Acts of 1897, and acting *ex officio* as State Tax Assessors, under Chapter 5 of the Acts of 1897, to make the assessment of railroad, telegraph, and telephone properties for taxation for the years 1897 and 1898, is hereby ratified and confirmed, and that said persons shall be deemed and held to have had and possessed all the authority and jurisdiction conferred, or sought to be conferred, by said Act (Chapter 5, Acts of 1897) upon the State Tax Assessors, and to have been legally appointed State Tax Assessors.

"SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

"Passed February 1, 1898."

It has been frequently held that such statutes may have a retrospective operation.

3. The third and last objection affecting the validity of the system of taxation is that it is unequal and void because it provides for back assessment of the properties of the common taxpayers for a term of three years, but wholly fails to provide for back assessment of the properties of railroads, telegraph, and telephone companies for 1897 and preceding years.

That there is ample provision for back assessment of the properties of common taxpayers cannot be disputed. Whether there is like provision for back as-

sessment of the properties of railroad, telegraph, and telephone companies for 1897, and the three preceding years depends upon the proper construction of Section 20 of the railroad assessment Act of 1897, which is in these words:

"SEC. 20. *Be it further enacted,* That if at any time it shall appear to the satisfaction of the Governor of Tennessee that any railroad, telegraph, or telephone company is inadequately assessed, or that its property has been omitted from taxation, or any new line has been constructed, it shall be his duty, and he shall have the power, to convene the said Board of Assessors to make the proper assessment, and they shall have the power to do so, and their assessment shall go to the Board of Equalizers, as upon appeal upon the record, as is provided in cases of assessment in the first instance. The Board of Equalizers shall examine and act upon such record as soon as practicable, and certify their final action to the Comptroller, the correction of the taxes so assessed to be then proceeded with according to the regular course, and neither the Comptroller of the Treasury nor any other officer than said Board of Assessors shall have the power or authority to back assess or assess any railroad, telephone, or telegraph company."

Prior to 1897 the Comptroller back assessed railroads under the general law authorizing all collectors of taxes to back assess. This created a new system, as in the cases of the pistol law, the druggist cases,

the school law, and repealed all former laws on the
same subject by implication.

There is nothing in the situation or in the lan-
guage of the Act that would indicate that back as-
sessment for former years, not barred, might not be
made under it.   But even if this contention be true
in fact, it is insufficient in law to render the taxing
system void.   Matters of this character are, like
methods of enforcing collection of taxes, left very
largely to the legislative discretion.   *Western Union
Tel. Co.* v. *Indiana,* 165 U. S., 304.

The conclusion is that our system of taxation is
valid.

#### IV.   INEQUALITY OF ASSESSMENTS.

Relief against unequal or disproportionate assess-
ments, from whatever cause, under a taxing system
such as prevails in Tennessee, is not to be found in
the Courts, but must be sought, in the first instance,
at least, if not exclusively, through the means pro-
vided by the taxing system itself for that purpose.
Cogent reasons of a public nature forbid the assump-
tion of such jurisdiction by the Courts.

To give relief the Court must substitute the action
or custom of delinquent officials for one of the
plainest mandates of the Constitution and the statutes,
and bring the rightful action of faithful officials down
from the constitutional and statutory standard to some
plane of official delinquency to be ascertained from evi-
dence.   The Court must disapprove and destroy the
rightful act of faithful officials and approve and set

up, as a standard for decision and future action, the wrongful action of unfaithful officials. The Court must do what the assessing officials could not themselves have done without perjury. The Courts cannot give any adequate relief, as to relieve one or more individuals may operate to increase the inequalities in other directions. The jurisdiction is impracticable of exercise, and would plunge the State into such litigation as would greatly embarrass its revenues. Such relief as the Courts could grant, by bringing legal official action down to the level of illegal official action, would utterly demoralize the public service and place an insurmountable barrier in the path of all progress toward better government.

It should be borne in mind that no system of taxation, however cunningly devised, ever has, and none ever can, produce perfect equality of assessments. That is an unattainable good—an unrealized dream. At the same time, any system, the very worst ever devised, is valid, if it does not necessitate inequality. Much inequality and injustice exists in taxation for which there is confessedly no remedy anywhere. Much would still exist, even if all assessments were to pass under the review of the Courts. It is doubtful whether the Courts would succeed better in this respect than other officials. Fortunately, however, the assessment of taxes has not been confided to the Courts, but to officials having more leisure and better advantages to perform that duty.

In these cases it should be noted—

(1) That the Assessors are exonorated from all fraud.

(2) That it is conceded that the property of the complainant taxpayers was not placed above the constitutitional or statutory standard of fair value.

(3) That the railroad, telegraph, and telephone properties were assessed and equalized by boards that had no connection with the assessment of the complainants' properties. This is beyond dispute, if the assessment of said properties made in 1897 shall be held the legal one. And it would seem the same result follows, even if the assessment of said properties made in 1896 shall be held the legal one for 1897. Assessments of railroads, etc., are not complete until the Board of Equalizers, or examiners, has passed upon them. They are therefore made, in a legal sense, by this final board. The Assessors gather the evidence, make up the record, and suggest valuations. This final board never has had any touch with county assessments. They did not even have revisory jurisdiction over the equalizations of real estate assessments made by the Board of Assessors under Act of 1895.

(4) That complainants do not suggest that they have resorted to any of the remedies for securing equality provided by the taxing system, much less that they have exhausted such remedies.

The averment of refusal of boards to equalize

without some averment that they asked them to do so upon some reasonable grounds, is insufficient.

It will not be disputed that the Legislature had the power to require property to be assessed at its fair value; that it has done. If, as appellees contend, the Constitution fixed the fair value of property as a standard for assessment, then it was the imperative duty of the Legislature to adopt that standard. Any statute fixing a different standard would have been unconstitutional and void. *Railroad* v. *Assessors*, 49 N. J. L., 1.

Beyond controversy, the Legislature has the power to provide the methods by which taxes shall be assessed and equalized.

It can create and designate the ordinary or special tribunals for this purpose, and make the action of such tribunals final and conclusive.

If the methods prescribed do not necessitate inequalities they are valid and constitutional, and the results reached through them, and declared final by the statute, must, like the judgments of Courts, be submitted to, however unjust or erroneous this may be in fact.

In *Tomlinson* v. *Board*, 88 Tenn., 1, 9, Judge Lurton, replying to the insistence of a taxpayer that he should be permitted, as a matter of right, to call witnesses before a County Board of Equalization, to show excessive valuation of his property, said: "To hold that it was their duty to permit the examination of witnesses offered by a complainant,

would imply a duty to the State and county to hear and examine witnesses to sustain the assessment. All this would imply a trial and a judgment upon weight of proof. The question of valuation is altogether a matter of opinion. Upon questions of opinion the greatest diversity may be expected. The sessions of this board terminate in two weeks, and at the end of that time they are required to return the assessment lists and their corrections to the Clerk of the County Court. In the populous counties the assessments reach into the thousands. That each taxpayer should have the right to come with his witnesses, and have them heard and be heard by counsel, would result in such delay and embarrassment as to amount to a great public peril with regard to the assessment of the public revenues. No legislative body could have seriously contemplated such a tribunal to determine a mere question of an excessive valuation for purposes of assessment. Occasional instances of excessive assessments may occur, but they had better be borne than that such a Court should be created to settle them. The taxpayer, in the first instance, may make his representation to the Assessor. If he overassess him he may carry the matter to a board of disinterested freeholders, acting under oath.''

The action of the board, which, under the statute, was made final and conclusive, was sustained, and the taxpayer had to submit. The Court could give no relief. If public policy forbids a full hearing before

such a board, how much more does it forbid a hearing by the ordinary methods in the Courts, after the boards have completed their labors?

It has already been shown that the system of taxation is not open to constitutional objection. It does not necessitate inequalities. The remedies that it provides for inequalities will be noticed elsewhere. The Legislature, not the Courts, must and can best judge of such remedies. They are and should be exclusive. The Courts will not undertake to say that any particular scheme of equalization, e. g., a general board, is better than all others, and the only adequate one. They will see to it that the Legislature does not adopt a plan that necessitates inequality. The Courts will not undertake to relieve against hardships that could have been remedied by appeal of the taxpayer to the special tribunals of the taxing system. There is no direct authority in Tennessee upon the question under consideration. The authorities elsewhere are almost unanimous against complainants' insistence. The cases involving disproportionate assessments of distinct and separate properties by independent Assessors or boards will be first noticed.

The New Jersey cases are the most numerous and satisfactory. Independently of the great weight accorded generally to the decisions of the Courts of that State, it happens that the Constitution and taxing system of New Jersey is substantially the same as our own. The Constitution requires property to

be assessed at its "true value." In that State, as in Tennessee, the railroads and some other companies are assessed by an independent State board, while other property is assessed by the local Assessors.

In one of the cases, in which the assessment of the State Board was assailed because the local assessments did not conform to the law, the Court said:

"The establishment of this system was much criticized by counsel, a prominent argument being that it necessarily introduced inequalities in the valuation of property for taxation, and that, by the force of its operation, such valuation was not made, as the Constitution requires, by a uniform rule, but a multiform rule. And, in support of this contention, the attention of the Court was directed to the fact, which had been established not only by the testimony, but by the report of the State Board of Assessors itself, that, though it was a universal practice of the Assessors of the different tax districts to rate property much below its real value, the State Board had rated this corporate property at its true value; that this discrepancy, arising out of the practical operations of the methods of valuation, existed, was not disputed, but this result, it is manifest, was not the legal or proper result of the plan of assessment thus introduced by the Legislature. That plan provided but one measure of valuation, and that is, the true value of the taxable property; and that measure was to be applied alike by the Assessors

16 P—45

and the State Tax Board, so that, if both sets of officers had performed their duties, there would have obtained that unity of rule that the Constitution demands. The local officers disobeyed the injunction of the law, and the contention is that the State officers should have pursued the same forbidden course, and that their acts should now be declared to be aborted because they refuse to perpetrate such a malfeasance. Such an argument, in our estimation, has no force whatever, and, indeed, it seems a novel suggestion that the Court should annul a proceeding because such proceeding conforms to the law."

In *Central R. R. Co.* v. *State Board of Assessors*, 49 N. J. L., 1, under a statute which provided that in case the valuation by the State Board of railroad and canal property should be relatively higher than the value of the property of other persons in any taxing district, as ascertained by the local assessors, the assessed value should be reduced so as to conform to the lower assessment, it was decided that where the local assessors had illegally taken but a percentage of what they deemed the true value of the property appraised by them, the State Board could not, even in obedience to a statutory mandate, take such reduced valuations as its standard of value, Mr. Chief Justice Beasley saying (p. 18):

"In the next place, it is objected that the real estate of these companies used for railroad purposes, other than main stem, has not been valued by the State Board in accordance with the statutory direction.

"We find the provision on this subject expressed in the terms following, viz.:

"'Sec. 4. That if the assessed value of the real estate of persons, other than railroad or canal corporations, in any taxing district wherein such railroad or canal property may be found, as ascertained by the Assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board shall be required to accept said valuation of the Assessors for such taxing district as a correct standard of value, and to thereby correct or reduce the separate valuation provided for in the second subdivision of section 3 of this bill.'

"The complaint is that in executing this provision the State Board refused to take the standard of valuation thus provided.

"The facts forming the basis of this proposition are these: The board reported that 'the main stem and personal property of all railroads have been valued, in accordance with the provisions of the law, at their full or true value, while the universal custom of local Assessors is to value for taxation at a percentage of true value, ranging all the way from forty to eighty per cent., averaging, it is thought, about sixty-five per cent. of true value.'

"It appears, therefore, that the board has taken true value as the standard, and has refused to discount anything from such estimation on account of the custom of the local Assessors in that respect.

It is now insisted that the standard erected by the Legislature, for the use of the State Board, was true value minus this percentage of deduction.

"But, if this be the proper interpretation of the section, the plain result is that the whole provision is absolutely void. It was not competent for the Legislature to put in force such a procedure. The Constitution says, in express terms, that property shall be assessed for taxation at 'its true value,' and if the Legislature has authorized it to be assessed otherwise, such direction is nugatory, and the Act must necessarily be enforced without reference to it.''

This decision was followed by the Supreme Court in *Williams* v. *Bettle,* 50 N. J. L., 132, where Mr. Justice Parker said (p. 136): "Another reason urged with much tenacity to set aside the assessment is the claim that the real estate, other than main stem, is assessed at a relatively higher value than the real estate of individuals in the same taxing districts. If this be so, it is in violation of the railroad tax law of 1884, and the valuation should be reduced. This claim is based upon the assessments made by the local Assessors, but the testimony shows that their valuations were less than the true value. In the case before cited, the Court held that the State Board of Assessors, in their valuation of property, are not necessarily to be governed by the valuations made by local Assessors in the same taxing district.

"The State Board of Assessors are to take the true value as the standard, and not discount from

their estimation of true value because of the custom of local Assessors to value property for taxation at less than its true value. It is not shown that the State Board of Assessors valued and assessed the lands of this company above its true value, or above the true value of the lands of individuals in the same taxing district."

This decision was affirmed by the Court of Errors and Appeals, in *Williams* v. *Bettle*, 51 N. J. L., 512, on the ground that the section relied on by the railroad company was unconstitutional, Mr. Justice Dixon saying (p. 516): "Error is also assigned upon the ground that the real estate of the company was assessed at a higher valuation than the other real estate in the taxing districts where it lay, contrary to the terms of the fourth section of said Act, which reads as follows: 'That if the assessed value of the real estate of persons other than railroad and canal corporations, in any taxing district wherein such railroad or canal property may be found, as ascertained by the Assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board (of State Assessors) shall be required to accept said valuation of the Assessors for such taxing district as a correct standard of value, and to thereby correct, or reduce the separate valuation provided for in the second subdivision of Section 3 of this bill.

"It is impossible to vindicate the constitutionality

of this section.    The Constitution requires that prop-
erty shall be assessed for taxes according to its value.
In carrying out this provision, of course it is neces-
sary that the judgment of some person should be
taken as the final criterion of the true value of each
parcel of property assessed, and it undoubtedly falls
within the province of the Legislature to say who
this person shall be.    If the Legislature had directed
the local Assessors to determine the true valuation
of the property used for railroad purposes in their
several districts, and the State Board to fix the tax
upon the value ascertained, the constitutional injunc-
tion would have been satisfied. . But no such enact-
ment exists.    The local Assessors have no authority
to determine the true value of property used for
railroad purposes, nor is such a power conferred upon
any persons except the State Board of Assessors and
the Supreme Court on certiorari.    The property so
taxed would be assessed, not according to its own
true value, but according to the true value of some
other property.    Such a tax the Legislature cannot
sanction.    This attempt of the Legislature to sub-
stitute . for the 'true value' of railroad property
'the assessed value of the real estate of persons
other than railroad or canal corporations,' 'as a cor-
rect standard of value' for railroad property, is un-
constitutional, and must fail.''

The directness and weight of these cases cannot
be minimized by any suggestion of difference between
the Constitutions of the two States.    There is no

substantial difference. At "true value" and "according to its value" mean value, no more and no less, and fix that as the constitutional standard. But if this were not true, the statute, which, as to citizens and officials, is equally obligatory, does provide for the standard of value, as was proper under any construction of the Constitution.

The Illinois cases are peculiarly instructive. In the earlier cases in that State the Courts, making the mistake not unusual with the Courts in their first efforts to equalize public burdens, undertook that very difficult task with vigor and determination. They reduced some railroad assessments, made at full value, to the plane of other assessments made by other officers in violation of the Constitution and the statutes, at one-third of their value. *Buren County* v. *Railroad*, 44 Ill., 229; *Railroad* v. *Boone County*, 44 Ill., 340. These decisions bore fruit in due season, and, as a result, the decision in *Railroad* v. *Stookey*, 122 Ill., 358.

In the latter case the same question was involved as in the former cases, and the same question, it may be added, that is involved in the cases at bar, for the statute of Illinois required property to be assessed at its "fair cash value." The Court said:

"Without stopping to inquire whether the constitutional provision in question was properly applied in those cases, it is sufficient to say that, in our opinion, it has no application to the circumstances of the present case. There is no claim, nor is there any

ground for the claim, that the provisions of the statute governing assessments, whether made by town Assessors or the State Board of Equalization, are in conflict with the Constitution.    The statute requires all property to be valued and assessed, for purposes of taxation, at its 'fair' cash value.' (Rev. Act, Secs. 3, 4.) This requirement, however, is nothing more than what the law would imply without it, for a simple, unqualified direction to value property, by its very terms imposes the duty of ascertaining and declaring its cash value.    While the appellant, as a basis for taxation, scheduled the road at $44,880, which was intended to represent half its value only, yet it is admitted in the bill that the total value of the road was $100,000, being only $5,150 less than the valuation placed upon it by the Board of Equalization. When it is considered that values rest so largely in mere opinion, about which men of equal intelligence and honesty often materially differ, this small difference between the road's conceded value and its estimated value by the State Board is not at all surprising, and is clearly not of sufficient consequence to justify the present proceeding.    The taxes complained of were extended upon this valuation in strict conformity with the statute, and this is expressly so declared in the bill.    It follows, therefore, that if any wrong has been done, it was done by the town Assessors and not by the State Board.    The law requires the State Board of Equalization to value the property at its fair cash value, and the

Ward v. Alsup.

taxes for that year to be extended against it upon
that valuation. All this was done in substantial
conformity with the requirements of the statute,
yet the action of the board is assailed and the tax
is in part sought to be set aside, simply because
the town Assessors probably failed to perform their
duty in respect to the assessment of other property
in the townships. The appellant in effect says
the board should have disregarded this law because
the town Assessors had done so in the assessment of
the other property in the two townships. This
view of the matter we do not regard as sound.
Valuations for purposes of taxation had necessarily
to be left to the judgment and determination of
some human tribunal. The Legislature in its wis-
dom has confided this duty and trust, in the case
of railroad property like the present, to the State
Board of Equalization, and that its action in the
premises was intended to be final, except where
fraud or corruption has intervened, is evidenced by
the fact that no appeal from its determination is
provided.''

It is to be remarked of these New Jersey and
Illinois cases, that the Courts refused relief against
confessedly gross disproportionate assessments, which,
so far as can be seen from the opinions, were made
under a system infinitely more objectionable than the
Tennessee system, as in those States, it does not
appear that taxpayers had, as in this State, the
benefit of appellate or revising boards, or even local

boards of equalization, much less the effectual remedy of back assessment for three years.

Under the constitutional and statutory system of taxation in force in this State, Courts will not grant relief to a taxpayer whose property, and all of its class, has been assessed at the constitutional and statutory standard of fair cash value, and no more, by abating his assessment to the level of other assessments, illegally and designedly made by the same Assessors below the value of the property.

The distinct ground upon which the jurisdiction in this class of cases rests, and the only ground available for assault upon the action of Assessors, is fraud. The complainants admit there was no actual fraud on the part of the Assessors.

In reviewing the cases under this head, it must be borne in mind (1) that the Constitution of Tennessee, unlike that in some of the States whose decisions are to be reviewed, contains the double requirement of assessment at full value and also with equality and uniformity, and that, therefore, equality is to be attained and both constitutional provisions observed, by assessing on the plane of full value.

"The equality required by the Constitution has no other test." (Ohio.)

(2) That Tennessee, unlike some of the States whose decisions are to be reviewed, has provided special remedies, as part of the system of taxation itself, for obviating and remedying the evils and injustice of unequal assessments, such as boards of

equalization, back assessments, etc. The importance of those considerations will become apparent in the course of the further discussion.

The Supreme Court of Ohio, in its earliest decision on this subject (*Bank* v. *Hines*, 3 Ohio St., 15), went to the fullest extent in granting relief to a taxpayer complaining of unequal or disproportionate assessment. *Cummings* v. *Bank*, 101 U. S., 133.

But, like the Supreme Court of Illinois, and all other Courts that have been tempted by hard cases to unwisely undertake the impossible task of correcting all inequalities in taxation, that Court repented at leisure, and subsequently announced a sounder and more practical view.

The case of *Cummings* v. *Bank*, 101 U. S., 153, was decided upon authority of the Hines case. Although the Cummings case involved a national bank tax, it was decided, upon consideration of the Constitution of Ohio, as construed in the Hines case.

After the decision in the Hines and Cummings cases, the latter in 1879, the Legislature enacted statutes authorizing back assessments of taxes. R. S., Ohio (1880), Sec. 2781.

Subsequently (1882) the case of *Wagoner* v. *Loomis*, 37 Ohio St., 571, was decided, in which the Court, without expressly overruling former cases, announces, in vigorous language, the correct doctrine. The Court held:

"That the statutes require all property to be

taxed at its true value in money, and the equality required by the Constitution has no other test.

"The complaint, in substance, is, that they (the officers) acted unlawfully and unjustly towards the plaintiffs in valuing their property for taxation at more than eighty per cent. of its true value in money. This great wrong the plaintiffs below would justify, on the ground that other property in the county was not returned for taxation at more than forty per cent. of its true value in money.

"If, upon this ground alone, a Court of Equity can say that the valuation of the plaintiff's property must be reduced from eighty to forty per cent. of its true value in money, because other property in Seneca County has been taxed upon only forty per cent. of its value, by what name shall we call the wrong that will be perpetrated upon the other eighty-seven counties of the State, where all property, including bank stock, has been assessed according to its true value in money, and upon which the rate required for State purposes has been paid?

"It must be remarked that in the petition of plaintiffs below, no fraud or conspiracy, or other unfaithfulness, has been charged against the officers and agents of the law, who placed the taxable property of Seneca County, other than bank stocks, upon the duplicate at a valuation of only forty per cent. of its true value. If it be possible that such a thing could have occurred through mistake, or error of

judgment, we are bound to say that such was the case, and such a thing is possible.

"Where, then, lies the equity of this case? While it cannot be said that the plaintiffs below should be compelled to pay more taxes, in proportion to the value of their property, than is required of other taxpayers of the county, it must be affirmed that other taxpayers should pay as much as is required of the plaintiff, in proportion to the value of their respective properties, and that is to say, until all have paid the required rate upon the full and true value of their respective properties.

"And, if for such reasons relief can be given to plaintiff, we see no reason why the like relief shall not be given to every taxpayer of the State whose property has been assessed on more than forty per cent. of its true value, even to the destruction of the revenues of the State.

"What relief a Court of Equity would give in a case of fraudulent conspiracy or combination, or rule adopted by those whose duty it is to fix the taxable values of property, for the purpose of imposing upon some property, or class of property, more than its just share of the public burdens, we need not inquire. No such combination or rule of action is shown in the case before us, hence, the doctrine announced by the Supreme Court of the United States in *Pelton* v. *Bank*, 101 U. S., 143, and *Cummings* v. *Bank*, 103 U. S., 153, does not apply in this case. But even in such cases

equity will not afford relief to a complainant who cannot show that the burden imposed upon him is greater than it would have been if the laws had been faithfully executed by taxing all property by a uniform rule, and according to its true value in money; and, also, that the tribunals provided in the system of taxation, for redress against inequalities, had been appealed to in vain.''

The Constitution of Ohio is somewhat peculiar in its provisions, but requires both assessment at value and equality, as does the Constitution of Tennessee.

After the Ohio system had, by enactment of a back tax system, been assimilated to the Tennessee system, the Court of that State, notwithstanding its former opinion seemingly to the contrary, decided that a taxpayer could not have relief unless he shows (1) that he is assessed not only disproportionately, but above what he should have paid if the laws had been faithfully executed, and (2), ''also, that the tribunals provided in the system of taxation, for redress against inequalities, had been appealed to in vain.'' This last clause refers manifestly to the then recent back assessment statute. The case is one strongly in point for appellees.

In *Bank* v. *Lucas County*, 25 Fed. Rep., 750, this Wagoner case is commented upon in this language: ''I understand that the Supreme Court of Ohio decided that, inasmuch as the Constitution and laws of the State provide for equality of taxation, by requiring all property whatever to be assessed for

taxation at its 'true value in money,' any citizen
whose property is assessed below that value has no
just cause of complaint because the property of other
citizens is assessed at less than his own, and his
only remedy is to apply to the assessing officers to
increase all assessments to their 'true value in money.'
This is the constitutional test of equality, and, even
where there is a fraudulent conspiracy to discrimi-
nate against a 'citizen, or a class of citizens, there
is no relief, unless it can be shown that the burden
imposed is greater than it would have been if all
assessments had been made at their 'true value in
money.' "

The later cases in Ohio seem to have gone back
to the rule stated by Chief Justice Waite, in his
dissenting opinion in the Cummings case, in these
words: "There can be no doubt that the shares of
this bank. were overvalued, as compared with other
property in the city, but if a State provides, by a
valid law, for the valuation of property for taxa-
tion, and furnishes appropriate tribunals for the cor-
rection of errors before a tax is assessed, if com-
plaint is made, I think it is not within the power
of a Court of Equity to enjoin the collection of the
tax simply because of an inequality in valuation, and
this as well when the error arises from the adop-
tion by the valuing officers of a wrong rule appli-
cable to many cases, as from a mistake in judgment
as to a single case. The valuation, as finally fixed
by the proper officer or equalizing board, under the

law, is, in my opinion, conclusive when there has
been no fraud.''

In neither the Hines nor Cummings cases does
the fact, which is controlling in the later case, that
the Constitution fixes value as the test of equality,
seem to have received attention.

The system of taxation in South Carolina is sub-
stantially the same as that in Tennessee.

In *Walter* v. *Chamberlain,* 60 Fed. Rep., 788, the
rights of a taxpayer in that State, claiming to have
been disproportionately assessed, came before Judge
Simonton for adjudication.

The case was this: A receiver of a railroad in-
stituted the suit to enjoin the collection of a part of
a tax assessed by a State Board. The pleadings are
thus stated in the opinion:

"After setting out the sections of the general
statutes of South Carolina prescribing the, mode of
making returns of railroad property for taxation,
and then averring that he had made his return for
the tax of 1891, fully conforming in all respects
with the requirements of the law, the bill goes on
to say that all real property in South Carolina as-
sessed for taxation has been heretofore, and is now,
openly and notoriously assessed for taxation at a uni-
form rate of fifty or sixty per cent. of its actual
face value, and that personal property is assessed
at the same rate, or less; that he made the return
of the property under his charge at the accustomed
valuation theretofore placed upon it, at from sixty

Ward v. Alsup.

to sixty-five per cent. of the same, which was fully equal to, and in reality higher than, the relative value of the property in the State; that this return having been filed with the Comptroller General, and having been submitted by that officer to the State Board of Equalization for railroads, that board considered the same, and raised the assessment from $13,000 per mile, as made by complainant, to $16,000, and in the case of the Carolina, Cumberland Gap & Chicago Railway property, leased by and so returned by complainant, raised it from $5,000 to $10,000 per mile. At the same time the same board raised the assessment of all the other railroad property in this State generally above the return made by them respectively. The bill then charges that this Board of Equalization for railroads made this increase in the assessment of railroad property, well knowing that the valuation fixed in their returns was fully equal to, and the same as, the average and uniform valuation of similar real and personal property in this State by other boards; that, in. making their valuation, County Auditors and County Boards of Assessment throughout the State had concurred in establishing a rate of valuation about 50 or 60 per cent. of the actual value, and that this Board of Equalization for railroads assessed the property at a value fully equal to, or greater than, its actual value, with the intent thereby to cast a great proportion of the burden of taxation on the railroads, and to

16 P—46

shield and protect from their just share of taxation other classes of property holders; that the Constitution of South Carolina provides that all property subject to taxation shall be taxed in proportion to its value, and directs the General Assembly to provide by law for a uniform and equal rate of assessment and taxation, and to prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory.

"The bill charges that this Board of Equalization for Railroads has violated this part of the Constitution; that by its action the property of all railroads in the State has been denied by the State the equal protection of its laws; and that this railroad property has been assessed and taxed unequally and unjustly, in violation of the fourteenth amendment to the Constitution of the United States. . . . The answer denies that the return made by complainant is true and correct in valuation of the property thereon. It denies that the sum paid is the amount of taxes really and justly due."

The Court then says "it cannot review the assessment made by the State officials simply upon the ground that it is excessive." And then adds: "But when the overvaluation of property assessed for taxation has arisen from the adoption of a rule of appraisement which conflicts with a constitutional or statutory direction, and operates unequally, not merely on a single individual, but on a large class of indi-

viduals or corporations, the Courts can give redress to the party aggrieved thereby.''

After quoting from the case of *Cummings* v. *Bank*, as to the design of officers making an unequal assessment, the Court says that before relief can be granted, it must appear that ''those whose duty it is to make the assessment must adopt a rule or system of valuation with the design that it shall operate unequally, and violate some fundamental principle of the Constitution.'' And the Court says that this design is an ''essential ingredient.''

After quoting the language of the Act under which the assessment was made, the Court says:

''Apart from the consideration that even if the assessment fixed by the board on the property of complainant is excessive, this Court cannot interfere (*Stanley* v. *Supervisors*, *supra*), there is no reason to think that the board do not, in the language of the Act, 'honestly believe that the value fixed by them on this property is its selling price at a fair sale.' ''

The evidence taken shows that property, real and personal, generally was assessed below its real value by the County Assessors, but the Court said:

'' But nowhere does it appear in the testimony that this is the result of preconcert, connivance, or conspiracy between and among the boards, such as appears in *Cummings* v. *Bank*, *supra*. There is evidence of coincidence in opinion and action, of concurrence in methods and in general result, but none

whatever—that is, of direct evidence—of preconcert in action. Such concert of action may possibly be inferred from similarity in the result, but the evidence shows that, although the boards all assessed real and personal property below its real value in money, the course of the several boards was capricious, without fixed method or percentage.''

The Court comments upon the ''independent action of this board under a statute imperatively requiring them, in making assessments, to take as a standard the true value of the property in money,'' and while the smaller increase of fifteen per cent. above the return of the plaintiff is specially mentioned in this connection, yet there was another piece of property returned at $5,000, and it was increased to $10,000.

Upon the whole case, the Court, after holding that there was no design upon the part of the local Assessors to cast the burden of taxation upon railroads. and no design upon the part of the State Board to do the same thing, said, ''After careful consideration, there appears no evidence of such a design as will alone give this Court jurisdiction.''

In the New Jersey, Illinois, and South Carolina cases there was a design to assess below value, upon the part of the local Assessors, but the State Boards followed the law, and, of course, no improper design could be imputed to them, and the Courts so decided.

There is not, and cannot be, any improper design imputed to the Assessors of complainants' property.

It was the duty of Assessors to assess at value, and they did so.

In *Lowell* v. *Commissioners*, 152 Mass., 372, relief was denied to a taxpayer complaining of disproportionate assessment, and the Court said:

"It is a violation of the statutes knowingly to make a valuation of property, for the purpose of taxation, at less or more than its full and fair cash value. The just proportion intended by the existing statutes is attained by assessing the property of different persons at a uniform rate, and upon its fair cash valuation. Whatever may be the remedy, if there be any, when it is shown that the Assessors have intentionally assessed the property of a part, or all of the inhabitants, at less than its fair cash value, we are of opinion that in a petition for the abatement of taxes on the ground of the overvaluation of the property, and of disproportionate taxation arising from such overvaluation, the question is whether the property has been valued at more than its fair cash value, and not whether it has been valued relatively more or less than similar property of other persons."

In Oregon the Constitution requires equality, but does not require assessment at value. Hence, in that State taxpayers have been accorded relief against the excess over an equal and uniform assessment. 24 Fed. Rep., 197; 28 Fed. Rep., 738; 48 Fed. Rep., 777.

In *Andrews* v. *King*, 1 Wash., 136, the Court,

in effect, holds that the dominant mandate of the statute under which the assessment was made, was equality, and that this had been purposely and fraudulently violated by the Assessor, and relief was granted.

The Kansas Constitution contains the equality clause, but no requirement to tax at value.

In *Railroad* v. *Atchison County*, 54 Kansas, 781, a railroad assessed at full value was granted relief because other property was assessed at twenty-five per cent. of its value. The Court manifested much irritation. The facts showed fraud on the part of Assessors. Injunction was authorized by statute as remedy in such cases. This case defines "basis," as used in assessment Acts. The 67 Fed. Rep. case simply follows this decision of the State Court.

In *Bridge Co.*, *ex parte*, 62 Ark., 461, the company's property was assessed at full value, while other property was assessed at fifty per cent. of its value by same Assessors. The appeal was direct from the action of the Assessors, under a statute authorizing the Courts to hear such cases, and raise or lower the assessments as justice might demand. The Court granted the relief, but refused to pass upon the constitutionality of the statute, which, if it intended more than that excessive assessments could be lowered on this direct appeal, was unquestionably in conflict with the Constitution, which required assessments to be made at value.

In *Board* v. *Railroad*, 59 Ala., 551, the Court

Ward *v.* Alsup.

declared a statute void and an assessment under it invalid because both were in violation of the constitutional rule requiring assessment at value.

The national bank cases are easily distinguishable from cases arising under Constitutions like those of Tennessee, New Jersey, Ohio, and some other States.

National banks are not taxable by the States without express permission of the Federal Government, and only to the extent of the permission granted. Congress has granted this permission to a limited extent only. They are taxable on their shares of stock at the situs of the bank, but not higher than "other moneyed capital." This statute is like the Constitution of States that have only the equality clause, but no requirement to tax at value. Hence the standard for taxation of these banks is not an absolute one at value, but a comparative one to be determined by the manner of taxing other moneyed capital, and assessment of bank shares will be entirely legal at full value if other moneyed capital is assessed at full value, but illegal as to the excess, if taxed at ten per cent. of its value, if other money capital is assessed at only five per cent.

Assessments under our Constitution, to be legal, must have two requisites. They must be (1) at full value; (2) equal and uniform at full value.

Assessments of bank shares must be equal and uniform with assessments of other moneyed capital, but need not be at full value. To grant such banks relief for disproportionate assessment, enforces

the statute in its entirety; to grant like relief to complainants, who are assessed at value, breaches one mandate of the Constitution and violates its entire spirit. Hence, these cases cut small figure in the settlement of this question. See *Bank* v. *Perea*, 147 U. S., 87.

Looking to the example of Ohio and Illinois Courts that have been compelled to retract or modify their earlier and more extreme decisions, it is well to receive, with some caution, the untried decisions of the younger States.

V.   PREVENTION AND REMEDIES FOR DISPROPORTIONATE AND UNEQUAL TAXATION.

The taxing system of this State contains, within itself, the means for prevention and remedy, so far as practicable, of unequal and disproportionate assessments, that are more practical and effective than any that can be applied by the Courts.

It must not be supposed that inequalities can be entirely abolished by any vigilance or wisdom of the State. That is impossible. The State must not be held blamable for the failure in the execution of its revenue laws any more than for failure in the execution of its criminal laws, where that failure results from the apathy of the citizen.

The State provides laws to punish crimes. For want of prosecutors or honest Courts and juries, crime may nevertheless go unpunished. The State affords a revenue system. It may be, that from want

of public spirit in the citizens and honesty in the officials of their selection, these laws will fall far short of efficient execution. The State that protects all must live, even if private inconvenience or injustice to individuals do occur. A policy must not be adopted to protect individuals that will destroy the State.

A specious argument has been suggested, that, as the State acts through all its Assessors, that it must be responsible if the aggregate result of the action of all is injury to the individual citizen. Conceding this, must not the citizen perform his part also? And in the application of this rule, the action of the State does not become complete and final until all the agencies appointed to effect a certain end have spent their force. The citizen cannot, as soon as the original assessor has acted, assume that his assessment is illegal, and resort to the Courts. The State's action is still *in fieri*. He must go to the Equalization Board provided to remedy his grievance. Though he fail there, still he may not resort to the Courts. The State has provided still other remedies for unequal assessments. If his neighbors are not adequately assessed, the law provides for their back assessment, and commissions each of its citizens to bring the delinquent before the proper officer for assessment or back assessment. The citizen ought to take a patriotic interest in public affairs. He ought not to look upon the State with as much indifference as if it were a corporation in which he merely

holds shares of stock and draws dividends. The citizen who refuses to prosecute delinquent taxpayers has no more right to complain of unequal taxation than the citizen who refuses to prosecute crime, or testify or sit on juries, has to complain of the bad administration of the criminal laws. The citizen who has eyes and sees not, and ears and hears not, should not be permitted to place the consequences of his own indifference to his own and the public interests upon the whole body of the people.

To give him relief by reducing his burdens increases his indifference. To refuse him relief interests him in the execution of the laws. Perhaps not another State in the Union has, in its taxing system, so many devices to prevent inequality as has Tennessee.

The main features of the system that tend to produce equality begin with the Constitution itself, and are these:

(1) The Constitution requires all property to be taxed at a uniform rate, and upon a uniform plane of actual value.

No State Constitution requires more, and few require as much.

It is proper to state, in this connection, that the Legislature, in its efforts at equalization, must conform to the requirement as to actual value, and may not provide for equalization by reducing assessments to any lower plane than actual value.

(2) The statutes enact the constitutional mandates

into law and provide the methods to carry them out.

(3) Every Assessor of taxes is sworn to obey the Constitution and faithfully execute the laws relating to the assessment of property, and to value it as therein directed. Each Assessor gives bond for faithful discharge of his duties, and is liable to indictment for willful misconduct, whereby any property "shall not be assessed, or shall not be assessed at its true value." Acts 1897, Ch. 1, Sec. 40.

Similar provisions are made as to railroads.

(4) Taxpayers are required to give in descriptive schedules of their property, and, for failure, are liable to thirty days' imprisonment.

The Board of Equalization is required to report delinquents to Attorney-general, who is required to prosecute them, and the grand jury is given inquisitorial power over this offense. Acts 1897, Ch. 1, Sec. 33.

Similar provisions are made as to railroads. Acts 1897, Ch. —.

(5) A Board of Equalization is provided for each county, to be appointed by the local authorities, with power to reduce "excessive" assessments, to correct errors, and to raise assessments that are too low. The action of this board is made "final" as to taxpayers, but, by express reservation, the matter is left open for back assessments for inadequate valuations. Acts 1897, Ch. 1, Sec. 42. For failure of a taxpayer to complain to a board of this character

of the undervaluation of other properties than his own, he was repelled by a Court of Equity, though showing a clear case of disproportionate assessment. *Mortgage Co.* v. *Charleston*, 32 Fed. Rep. (Ore.), 192. There is a corresponding scheme for equalization of railroads, etc. Acts 1897, Ch. —.

(6) And, after all these precautions have been taken, lest omissions or inequalities may have occurred, a most elaborate system, or rather systems, of back assessments is provided. As to common taxpayers, this is the provision:

"Sec. 26. *Be it further enacted*, That should it, at any time after the assessments have been made, come to the knowledge of the Chairman or Judge of the County Court, the Clerk of said Court, County Trustee, Sheriff, or any other officer or person of any county in this State, that any person, company, firm, or corporation in said county has not been assessed as contemplated by the provisions of this Act, or has been assessed or has paid taxes of an inadequate amount, it shall be the duty of said Chairman or Judge, Clerk, Trustee, Sheriff, or other officer or person, on motion of the District Attorney, or Clerk, or Revenue Agent for the State, to cite said person, company, firm, or corporation, their agent, representative, or atterney, to appear before the Trustee, or County Court Clerk in case of merchant's taxes, for the purpose of being assessed according to law, and said Trustee, or County Court Clerk in case of merchant's taxes, is hereby author-

ized and empowered to make proper assessment against
such person, firm, company, or corporation; and should
it appear that said person, firm, company, or corpo-
ration did in any manner connive at or purposely
evade said assessment, or did knowingly permit an
inadequate assessment to be made, said Trustee, or
County Court Clerk in case of merchant's taxes,
shall correct said assessment, and, in case of *ad
valorem* taxes, add thereto a penalty of 25 per cent.,
and cause the whole to be entered upon the tax
books for collection." Acts 1897, Ch. 1, Sec. 26.

In *Marsh* v. *Arizona*, 164 U. S., 600, it was
said of a statute of this character:

"Evidently it was the intention of the Legislature,
and a just intention, that no property shall escape
its proper share of the burden of taxation by means
of any defect in the tax proceedings, and that if
there should happen to be such defect, preventing
for the time being the collection of the taxes, steps
might be taken in a subsequent year to place them
again upon the tax roll and collect them." (P. 607.)

In addition to this drastic provision, each and
every collector of taxes is made an assessor of omit-
ted property, and he is required "to immediately
assess the same, and proceed to collect the taxes."
Code, §§ 3814, 3815 (S.).

And still further, the county collectors are re-
quired to make assessments of omitted property, to
be known as the "picked up" list, and collect the
taxes thereon. Acts 1897, Ch. 1, Sec. 47.

It is difficult to see what could be added to these provisions that would be calculated to get more perfect assessments. The collectors, who are constantly traversing the counties, and visit nearly every home in the State, are made detectives to discover omitted property and assess it.

It is made the duty of certain officers by name, and of "any other officer or person," to bring delinquents to the attention of the public authorities and have them assessed by one of the two or three officers found in every county. The Attorney-general and Revenue Agents are required to assist in this matter, and the taxpayer is mulcted twenty-five per cent. if he connived at his inadequate assessment. What further provision can be suggested? As to railroads, etc., there is ample provision for their back assessment, which may be done at any time upon call of the Governor, to whom every citizen has access and can make complaint. Acts 1897, Ch. —.

These back assessments may be made at any time within three years.

Four Revenue Agents are also in the employ of the Comptroller's office to look after the prompt collection of taxes.

In the face of a system like this, the railroad attorneys, in their brief in the L. & N. case at Cincinnati, state that the State authorities have acquiesced in the inadequate assessment of property.

The State has collected hundreds of thousands of revenue under this back assessment system. There

has been constant protest against inadequate assessments, as shown by the Comptroller's reports and by the severe provision of the statutes. This protest has not been in vain.

While, as stated in said brief of the railroad attorneys (p. 136), that the real estate of Davidson County was assessed in 1871, at only $8,000,000, while the same lands were valued on the United States Marshal's books at $22,000,000, it appears in the record in the same case, from the affidavit of the present Assessor, that lands in Davidson County are at present assessed practically at their full taxable value.

This result, in the largest county in the State, shows very satisfactory progress. Why should the Courts interfere with the operation of a system of this sort? The Courts cannot, under the Constitution and statutes of this State, any more than the Assessors or the Legislature, put assessments down below actual value. If they could do so, what standard, outside the Constitution or statutes, would they adopt? The evidence would be exceedingly conflicting as to the customary rule. Can the Courts afford to supplant the Constitution and statutes by a custom? Will the Courts tear that down which has been legally done, to the level of illegal action, or will they permit the system provided for the purpose to build up the illegal action to the standard of the Constitution and laws? Will the Court condemn the faithful and approve the unfaithful official? Will the Court, by

its example and precept, say to the public officials that they may—nay, must—discard the Constitution and statutes and follow the will-o'-the-wisp of the custom or usage of those who have habitually violated both?

Will the Court bar the path of progress and make good government impossible? For, if each succeeding assessment must conform to, and can rise no higher than, its illegal predecessor, but may lawfully fall lower, we may expect to see the State entirely bereft of its revenues. The State can no more, under the rule suggested, return to proper methods than a man can lift himself over a fence by his boot straps. The Courts have no power to deal adequately with this matter—not half the power that exists under the system. If the taxpayers would make the same efforts before the taxing officials they have made in the Courts, they would doubtless secure better results. But certainly they cannot come into the Courts until other means have been tried and failed them. Back and reassessments will obviate inequalities, whether of individuals or a class, or whether the result of fraud or other cause. The remedy is to be found in the system, not in the Courts, and by raising up illegal assessments to actual value, not by tearing legal ones down. The extreme reluctance of the Courts to interfere in these matters, and the reasons for it, are well expressed in the words of Mr. Justice Miller, in *Railroad Tax Cases*, 92 U. S., 575:

"One of the reasons why a Court should not thus interfere as it would in any transaction between individuals, is, that it has no power to apportion the taxes, to make a new assessment, or to direct another to be made by proper officers of the State. These officers, and the commission under which they shall exercise their functions, are wholly beyond the power of the Court when so acting. The levying of taxes is not a judicial function; its exercise, by the Constitutions of all the States and by the theory of our English origin, is exclusively legislative. A Court of Equity is, therefore, hampered in the exercise of its jurisdiction by the necessity of enjoining the tax complained of, in whole or in part, without any power to do complete justice, or make, or cause to be made, a new assessment on any principle it may decide to be the right one. In this manner it may, by enjoining the levy, enable the complainant to escape wholly the taxes for the period of time complained of, though it be obvious that he ought to pay the taxes if imposed in a proper manner."

These reasons, it will be perceived, have double force in a case of this character, where the Court can relieve only a single taxpayer from the alleged inequalities, leaving the many in the same category to suffer injustice, who have paid their taxes, or prefer to do so rather than stand a suit. As a matter of fact, all or nearly all, the taxes for 1897 have already been paid.

16 P—47

OPINION.

SNODGRASS, Ch. J.   These two causes involve, in the main, the same questions, and, by request of counsel, are heard together.   They are suits to recover taxes alleged to have been paid under protest. Demurrers were filed in both cases and sustained and the suits dismissed, and appeals prayed to this Court.

In this Court Messrs. E. H. East, Dickinson & Waller, Vertrees & Vertrees, Fentress & Cooper, and Adams & Trimble, reputable attorneys, have intervened as *amici curiæ,* and by petition represent to the Court that the suits are merely colorable, and brought not in good faith, but to obtain the opinion of this Court upon a feigned issue in order to affect and control the determination of other cases of great importance pending in the United States Courts, in which they and their clients are interested, and which involve large amounts and very serious questions.   This petition is supported by affidavit.   A counter petition, or motion, has been filed, also supported by affidavits, in which the good faith of the suits is insisted upon and the right of the petitioners to intervene is denied.   In connection with their petition and affidavit, the intervenors present the questions and authorities hereinafter stated and quoted to establish their right, and to show that though some of them are of infrequent consideration in this Court, they are definitely settled here, as elsewhere.

The first question presented is whether an attor-

ney who is not employed in a cause pending in this Court has the right to appear in behalf of a client not a party to the suit, or in his own behalf, as *amicus curiæ*, and to have the Court pass upon the *bona fides* of the suit.

Attorneys are officers of the Court, and it is their function to see that justice is administered according to law. It has been held that it is not only the right but the duty of an attorney, if he knows, or has reason to believe, that the time of the Court is being taken up by the trial of a feigned issue, to inform the Judge thereof, whether of counsel in the case or not. *Haley* v. *Eureka Co. Bank*, 12 L. R. A., 815; *State* v. *Wilson*, 2 Lea, 210; 2 Enc. Pl. & Prac., 344.

When a suit is brought with the view of affecting the rights of third parties, and it is apparent that this is the sole object, the suit is not adversary, but collusive, and should be dismissed. *Haley* v. *Eureka Co. Bank*, 12 L. R. A., 815; *Meeker* v. *Straat*, 30 Mo. App., 243. It has also been held that a suit prosecuted for the purpose of obtaining a judgment that may, by way of precedent, affect the rights of third parties, should be dismissed, and is a contempt of Court. *State* v. *Wilson*, 2 Lea, 210; 2 Enc. Pl. & Prac., 344; *Lord* v. *Veazie*, 8 How. (U. S.), 255; *Smith* v. *Junction R. R.*, 29 Ind., 546; *Nevada* v. *McCullough*, 20 Nev., 154; *Brewster* v. *Ketchum*, Comb., 425; *People* v. *Tyler*, 30 Cal., 223; *Fletcher* v. *Peck*, 6 Cranch, 147.

It is essential that the object of every action be to settle a real controversy existing between the parties. If it appear that such is not the object, the action will be regarded as fictitious, and will be dismissed by the Court, and the bringing of a fictitious suit may be punished as a contempt of Court. 9 Enc. Pl. & Prac., 720, and cases there cited.

In *Lord* v. *Veazie*, 8 How., 225, Taney, Chief Justice, speaking for the Supreme Court of the United States, said, among other things: "In order that a suit be *bona fide*, and not fictitious, there must be an actual controversy and adverse interests." In that case, the Court held the objection to the action was not that it was amicable, but that there was no real conflict of interests; that the plaintiff and defendant had the same interest adverse to, and in conflict with, the interests of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both parties to the suit desired it to be decided. See, also, to the same effect: *In re Elsam*, 3 Barn. & Cress., 597; *Fletcher* v. *Peck*, 6 Cranch, 147; *Cleveland* v. *Chamberlain*, 1 Black, 419; *Smith* v. *Junction R. R. Co.*, 29 Ind., 546; *Berks Co.* v. *Jones*, 21 Pa. St., 416; *Haley* v. *Bank*, 12 L. R. A., 815; 2 Enc. Pl. & Prac., 344; *Hasket* v. *State*, 51 Ind., 176. The subject is reviewed at length, and cases collated and commented on, in *Haley* v. *Eureka County Bank*, 12 L. R. A., 815 *et seq.*

It is not sufficient that the parties be real and

not fictitious, but the controversy must be real and not *pro forma*, nor is it sufficient that the facts exist as they are set out in the action; nor that the complainant has a cause of action, but beyond these, the question arises, Is the suit prosecuted to redress the grievance of the plaintiff, or to affect third persons, who may be interested in the same question already pending in another suit, and which is the primary and real object of the proceeding? If the latter, the suit should be dismissed. Courts cannot be used for the purpose of deciding even real questions in *pro forma* suits, especially when the object and purpose is to affect important litigation between other parties. If so, the most complicated and difficult questions of law, and the constitutionality of statutes might be settled by the Court upon such *pro forma* proceedings, when no real controversy or adverse interests exist, and no proper examination of the important questions is made by counsel or the Court.

It has been uniformly held by this Court that an appeal from a judgment or decree rendered *pro forma* in the Court below will be dismissed by this Court, and this when the parties and controversy are real and the *pro forma* decree is entered in order to have this Court pass upon the question of law involved. *Reed* v. *Robb*, 4 Yer., 66 ; *State* v. *Wilson*, 2 Lea, 210 ; *Mayo* v. *Dickens*, 6 Yer., 490 ; *Mem. Frt. Co.* v. *Mayor*, 3 Cold., 249.

The principles here laid down are universally rec-

ognized and enforced in all Courts and jurisdictions, and · the proper practice and duty of the appellate Court is plainly pointed out in a number of cases. See the entire subject treated and cases collated in 2 Encl. Pl. and Pr., pp. 342, 343, 344.

There is nothing in this rule which prevents the bringing and trial of agreed cases under the provisions of the statute. Shannon, §§ 5206–5210, and 6330. Indeed, that practice, within proper limits, is to be commended and encouraged. But it has been held that an agreed case, prepared without real litigation, is a fraud upon the Court, and a contempt on the part of those implicated. *State* v. *Wilson*, 2 Lea, 210.

When a decree was entered *pro forma* in the Court below, by agreement, from which an appeal was taken, it was held to be not an agreed case, and the Supreme Court had no jurisdiction of the appeal. *Reed* v. *Robb*, 4 Yer., 67.

There is a vast difference between an agreed case to settle a matter of real controversy between the parties, and a simulated suit between parties ' having no adverse interests, and only interested in having a judicial holding, in order that it may be controlling in another suit already commenced, where there is real litigation.

Conceding these to be the rules when proper cases are presented, the question recurs, How are we to determine whether these suits are in good faith or merely *pro forma*, and intended for some other purpose? We have a petition supported by affidavit that

the suits are *pro forma*, and merely with the purpose of affecting other suits, and that such is the primary object. On the other hand, it is denied by answer and affidavits that such is the case.

It has been held that a suit may be shown to be fictitious by the record, or by evidence aliunde, or both. 2 Enc. Pl. & Pr., 344; *Haley* v. *Eureka County Bank*, 12 L. R. A., 815. Or upon affidavits of third persons. *Smith* v. *Junction Ry. Co.*, 29 Ind., 546; *Cleveland* v. *Chamberlain*, 1 Black, 419; *Lord* v. *Veazie*, 8 How. (U. S. Sup. Ct.), 225. Or the case may be referred to the Clerk for proof. *In re Elsam*, 3 Barn. & Cress., 597; *Sage* v. *Swenson*, U. S. Sup. Ct., MSS. Opinion.

Where a sharp issue is presented to this Court, by reputable attorneys on both sides, as to whether or not suits are brought in good faith, or for an ulterior purpose of affecting pending litigation between other parties, this Court would not proceed to a hearing of the merits, until the preliminary question is fully investigated and determined. In the present cases, however, we need not determine whether the intervenors have made out their contention, nor need we proceed any further with the investigation, inasmuch as we find that the issues are not presented in the records in such manner as to warrant the Court in passing upon the many questions supposed to be raised, and upon which the opinion of the Court is sought. Both of these cases are purely legal actions under the statute, and though one of them is brought in

the Chancery Court, no equitable questions are involved. In neither of them is there any allegation that the plaintiff or complainant has pursued the provision of the statute for correcting unequal and excessive assessments by going before the ,Board of Equalization of his County, and making complaints to such board before paying his taxes, which we consider an indispensable prerequisite to the bringing of any merely legal action to recover back taxes, paid under protest, conceding the litigation to be real and *bona fide.*

By the Act of 1895, Ch. 120, Sec. 50, the powers and duties of the County Board of Equalizers are set out and defined, and it is made the duty of that board, among other things, to examine, compare and equalize assessments, to hear and adjust complaints from any party feeling aggrieved on account of such assessments, and to correct all errors, when in its judgment, justice demands it, etc. Shannon, Sec. 802.

By the same Act, Sec. 62 ( Shannon, § 807 ), the State Board of Equalizers were required to proceed to the equalization of the aggregate value of real property of the various counties, and lower or raise assessments as they may deem proper.

It will thus be seen that plaintiffs had the remedy of an equalizing board, before whom their complaints could be, and, certainly, in the absence of any equitable reasons in avoidance, should have been, made, and this board had ample power to pass upon and rectify

their individual grievances. There is nothing in the record to show that any application or complaint was made to the board, or that either of the plaintiffs ever went before the board.

It has been held, that when, by a valid statute, a Board of Assessors or Equalizers is created with power to act, a taxpayer who fails to make application to such board for relief, when it has power to act, cannot pay under protest and then recover back the tax in an action for that purpose. It is said to be everywhere a settled rule that application must be made to the statutory tribunal provided for that purpose, if one is provided, before any legal action is taken to recover back the tax. *Stanley* v. *Supervisors*, 105 U. S., 305; *Stanley* v. *Supervisors*, 121 U. S., 549; *Price* v. *Kramer*, 4 Col., 546; Van Nort's Appeal, 121 Pa. St., 113; *State* v. *Wright*, 4 Nev., 251; *First National Bank* v. *St. Joseph*, 46 Mich., 530; *Felsenthal* v. *Johnson*, 104 Ill., 21; *People* v. *Lots in Ashley*, 122 Ill., 297; *Boorman* v. *Juneau Co.*, 76 Wis., 550; *Buttenuth* v. *St. Louis Bridge Co.*, 5 Am. St. Rep., 546; *Shattuck* v. *New Orleans*, 39 La. Ann., 206; *Leeds* v. *Hardy*, 43 La. Ann., 810; *People* v. *Duguld*, 68 Hun, 243; *Johnson Co.* v. *Searight Cattle Co.*, 3 Wyo., 777; *Caledonia* v. *Rose*, 94 Mich., 216; 25 Am. & Eng. Enc. L., 242, 453 *et seq.*

The rule is tersely stated in 25 Am. & Eng. Enc. L., pp. 241–244, as follows: "When provision is made for an application to a Board of Equalization or

Review for the correction of errors in an assessment, such remedy is exclusive, and a taxpayer failing to avail himself thereof, within the time prescribed, cannot prevent the collection of a tax for any cause for which he might have had an abatement; but this rule does not apply when the tax is illegal by reason of want of power to levy or assess, nor where the assessment is fraudulent.'' (Page 244, note 1.)

In this case there is no allegation that the Assessors did not have the power to make the assessment, and none that it was fraudulently made, but the latter feature is expressly disclaimed, and the complaint is as to the manner in which the assessment is made and the amount. It is held that an effort to correct an alleged error in the assessment, while the matter is in control of the board, is essential to relief in the Courts. *Shattuck* v. *New Orleans,* 39 La. Ann., 206; *Leeds* v. *Hardy,* 43 La. Ann., 810.

Also, a failure to appear before the Board of Assessors on grievance day has been held such laches as to deprive one of his remedy by certiorari. *People* v. *Duguld,* 68 Hun (N. Y.), 243.

Again, a suit to recover back taxes is defeated by showing that objection to the overassessment complained of was not made before the Board of Equalization. *Johnson Co.* v. *Searight Cattle Co.,* 3 Wyo., 777.

So, also, a taxpayer who fails to appear at the time and place appointed cannot afterwards assail the

assessment. *Caledonia* v. *Rose*, 94 Mich., 216; *Smith* v. *Marshalltown*, 53' N. W. R., 286.

In *Michigan Savings Bank* v. *City of Detroit*, 107 Mich., 246 *et seq.*, it was held that boards of review are the proper tribunals for the correction of unjust assessments, and parties will not be heard in the Courts until they have exhausted their remedies before these tribunals. The text books lay down the same doctrine.

Mr. Cooley, in his work on Taxation, says: "The statutory remedy (for equalization) is supposed to be adequate to all the requirements of justice, and it is the party's own folly if he fails to avail himself of it." Cooley on Taxation, p. 529; *Weaver* v. *State*, 39 Ala., 535. Suit will not lie at law for the levy of an irregular or excessive assessment which might be corrected on review or appeal. *Wright* v. *Boston*, 9 Cush., 233; *Bourne* v. *Boston*, 2 Gray, 494; *Commonwealth* v. *Cary*, 98 Mass., 19, cited in notes to Cooley on Taxation, p. 529.

The general subject of correction of illegal, excessive, and improper assessments is considered by Mr. Desty in his work on Taxation, Vol. 2, pages 625–627, also pages 654, 661. It will be seen that much depends upon the statutes of the State, and the means and modes of correction provided, but the general principle is, that when a tribunal and mode is provided, that must be availed of before the taxpayer can have ordinary relief at law.

In summing up, he says: "As a general rule,

for a mere irregularity the statutory remedy is exclusive, and the party must avail himself of it or suffer the consequences of his neglect, and, if he does not have his assessment corrected and perfected when he has power to do so, he is assumed to admit its correctness, and the Court may, in its discretion, refuse to aid him, and, when the assessment is not fraudulent, he loses all remedy."

It is proper to remark again that in this case fraudulent conduct in the Assessors is not only not charged, but expressly disclaimed. See, also, the cases cited by the author in support of his text.

Again the same author says : " When a person claims that the assessment of taxes was excessive, but failed to apply to the Board of Appeals to have the error corrected, and no excuse is given for his failure to apply at the proper time, the Courts cannot interfere to stay the collection of the tax." 2 Desty on Taxation, 654, and cases cited.

And again, at page 662 : " If a taxpayer, by failing to pursue a remedy for the correction of irregularities in the assessment and levy of taxes, waives or loses his right to resist the collection of the taxes, the exaction of payment by the Treasurer is not illegal or erroneous. If that remedy is not pursued, the tax may be collected. If he does not have his assessment corrected and reviewed when in his power to do so, it is an admission of its correctness. He must proceed in the manner prescribed by statute."

It is true the Tennessee statute gives the tax-

payer a remedy by paying under protest, if he conceives his taxation to be illegal, unjust, or excessive, or against any statute or clause of the Constitution, and then by suing the collector to recover back the amount thus unjustly exacted, but this clearly contemplates that the taxpayer must, in case of irregular, improper, or excessive assessments, made by the proper officials, have made complaint before the board appointed by the statute to hear such complaint and to inquire into the assessment and the manner in which it is made, and whether it is or is not excessive. The County Trustee has no power to do this, but only to collect such taxes as come to him already assessed, except in certain cases of omitted property, etc.

If a party contemplates questioning the entire system of assessments or the special assessment of his own property, by the statutory action to recover amount demanded from him, he must put himself in position so to do by lodging his complaint, first, with the board appointed to hear such complaints under the law, and in the time provided by statute. The statute which provides that the taxpayer must pay his taxes under protest and then sue to recover them back, and that this remedy should be exclusive, was intended to prevent the tying up of taxes by injunction and other process, so that the State's revenue might not be tied up with litigation, but the theory was that if the assessment had reached such a stage that the tax was

levied and collectible, the taxpayer then should pay and take his remedy to recover back. But in order to have this remedy, in the absence of fraud or other ground of equitable intervention, he must have availed himself of such provisions of the statute as would have corrected the injustice complained of before the tax was levied and made collectible.

Inasmuch as neither of the parties complaining in these causes alleges that he has ever gone before any Board of Equalization and sought to have his assessment rectified because of its alleged illegality, or inequality or excessiveness, neither occupy such an attitude as to raise the important questions relating to the assessments presented by them and supposed to be involved, and upon which the action of the Court is sought, and whether the suits are real or only simulated, whether *bona fide* or brought with an ulterior purpose, they cannot be considered upon the merits of the questions presented, and, without going further with the investigation of the manner in which, and the purpose for which they were brought, the judgment in one and the decree in the other must be affirmed, and the cases must be dismissed because of the failure of complainants to resort to the plain preliminary remedy provided by the law to have assessments corrected.

The suits are therefore dismissed, at cost of appellants.